# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR JUAN AYALA, | CASE NO. 01cv1322-IEG(PCL) |
| Petitioner, | |
| vs. | Order Denying Petitioner's Motion for Summary Judgment on Group 2 Claims and Denying Request for Evidentiary Hearing [Doc. No. 154]; Granting Respondent's Motion for Summary Judgment on Group 2 Claims [Doc. No. 148] |
| ROBERT L. AYERS, JR., Acting Warden of the California State Prison at San Quentin, | |
| Respondent.[1] | |

Petitioner Hector Juan Ayala and Respondent Steven Ornoski have moved for summary judgment on Petitioner's Group 2 claims which include Grounds 1, 2, 4, 5, and 9 of his Third Amended Petition.  The parties have filed opposition and reply briefs.

A hearing was held before Chief Judge Irma E. Gonzalez on August 15, 2006.  Anthony Dain and Tiffany Salayer appeared on behalf of Petitioner.  Steven Oetting of the California Attorney General's Office appeared on behalf of Respondent.  Following the hearing, upon the Court's request, the parties also filed supplemental briefs on the possible implications of two recent Ninth Circuit decisions on the Group 2 claims.

Upon consideration, the Court DENIES Petitioner's motion for summary judgment and GRANTS Respondent's motion for summary judgment on the Group 2 claims.

///

---

[1] Robert L. Ayers, Jr. is the is the current Acting Warden at San Quentin, and the Court directs the Clerk to reflect this in the case caption.

### *OVERVIEW*

By an amended information filed on January 20, 1987, Petitioner Hector Juan Ayala ("Petitioner") and his brother Ronaldo Medrano Ayala were charged with the murders of Jose Luis Rositas, Marcos Antonio Zamora and Ernesto Dominguez Mendez.  The information alleged that the murders were committed on or about April 26, 1985, during a robbery attempt where the brothers held four men captive in an automobile repair shop.  Both men were also charged with the attempted murder of Pedro Castillo, who was shot during the drug-related robbery attempt, but who escaped and survived. At trial, the prosecution also presented evidence that a third man, Jose Moreno, helped in the commission of these crimes.  Castillo provided the information to police that led to the arrests and was the key prosecutorial witness at trial.

Petitioner was convicted on August 1, 1989, of three counts of first-degree murder in violation of California Penal Code ("CPC")  § 187, one count of attempted murder in violation of CPC §§ 664 and 187, and one count of robbery and three counts of attempted robbery in violation of CPC §§ 664 and 211 -- each count with findings that Petitioner used a firearm in the commission of the crimes in violation of CPC § 12022.5.  Petitioner was also found guilty of the two special circumstance allegations, multiple murder under CPC § 190.2(a)(3), and murder in the attempted commission of a robbery under CPC § 190.2(a)(17)(1).  The jury returned a verdict of death for each of the three murders on August 31, 1989, and the court entered judgment in accordance with the verdict on November 30, 1989.

Petitioner filed his opening brief on automatic appeal to the California Supreme Court on April 23, 1998, raising nineteen (19) separate issues.  The California Supreme Court denied the appeal on August 28, 2000.  People v. Ayala, 24 Cal.4th 243 (2000).  On November 15, 2000, the state court denied the petition for rehearing.

On August 9, 1999, Petitioner filed a habeas petition with the California Supreme Court, raising three (3) grounds for relief.  Petitioner was not granted an evidentiary hearing on those claims and his petition was summarily denied on the merits on August 30, 2000.  On March 15, 2001, Petitioner filed a Writ of Certiorari with the United States Supreme Court, which was denied on May 14, 2001.  On May 14, 2001, his judgment became final.

1    On July 20, 2001, Petitioner filed a request for appointment of counsel to handle his federal

2    habeas petition.  Petitioner filed an initial petition in this court on May 14, 2002.  After later filing

3    a Second Amended Petition in this court on December 13, 2002, Petitioner filed a second state

4    habeas petition in the California Supreme Court on March 17, 2003.  The state petition was filed in

5    order to exhaust several unexhausted claims.

6    Petitioner filed his Third Amended Petition with this court on December 9, 2004.  On

7    April 11, 2006, the Court denied Petitioner's request for an evidentiary hearing regarding

8    Petitioner's Group 1 Claims (Claims 12 and 13) and granted Respondent's motion for summary

9    adjudication of those claims.

10    ***STANDARD OF REVIEW***

11    Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

12    habeas corpus claims:

13    The Supreme Court, a Justice thereof, a circuit judge, or a district
      court shall entertain an application for a writ of habeas corpus in
14    behalf of a person in custody pursuant to the judgment of a State
      court only on the ground that he is in custody in <u>violation of the</u>
15    <u>Constitution or laws or treaties of the United States.</u>

16    28 U.S.C. § 2254(a) (West 1994) (emphasis added).

17    In <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997), the United States Supreme Court held that

18    the new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA")

19    "generally apply only to cases filed after the Act [AEDPA] became effective."  In capital habeas

20    actions, cases are typically commenced by the filing of requests for appointment of counsel and

21    stays of execution of the petitioners' death sentences.  Petitioner filed his request for appointment

22    of counsel and stay of execution on April 27, 2001 and filed his petition with this Court on May 6,

23    2002.  The AEDPA became effective on April 24, 1996, when the President signed it into law.

24    <u>See</u> <u>id.</u>  Accordingly, the AEDPA applies to this case.

25    Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d),

26    which now reads:

27    (d) An application for a writ of habeas corpus on behalf of a person in custody
      pursuant to the judgment of a State court shall not be granted with respect to any
28    claim that was adjudicated on the merits in State court proceedings unless the
      adjudication of the claim-

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West Supp. 2005).  "A state-court decision is 'contrary to' . . . clearly established precedents if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'"  Early v. Packer, 537 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  A state court decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extent that principle to a new context where it should apply."  Williams, 529 U.S. at 407.

Even when the federal court undertakes an independent review of the record in the absence of a reasoned state court decision, the federal court must "still defer to the state court's ultimate decision."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  If the state court decision does not furnish any analytical foundation, the review must focus on Supreme Court cases to determine "whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law."  Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2001).  Federal courts also look to Ninth Circuit law for persuasive authority in applying Supreme Court law and to determine whether a particular state court decision is an "unreasonable application" of Supreme Court precedent.  Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

### *TEAGUE v. LANE*

The United States Supreme Court, addressing perceived inconsistencies in its prior rulings regarding retroactive application of its decisions, held that "new" constitutional rules of criminal procedure will not be applied retroactively to cases on collateral review unless they fall within two narrow exceptions.  Teague v. Lane, 489 U.S. 288 (1989).  A new rule is one that "breaks new

- 4 -

ground or imposes a new obligation on the States or the Federal Government" or one whose "result was not dictated by precedent existing at the time defendant's conviction became final." Id. at 301.  The two exceptions to the Teague rule are: (1) rules placing certain kinds of private individual conduct beyond the power of the criminal law to prohibit, and (2) procedures implicit in the concept of ordered liberty without which the likelihood of an accurate conviction is seriously diminished.  Penry v. Lynaugh, 492 U.S. 302, 305 (1989); Graham v. Collins, 506 U.S. 461, 478 (1993).

When the state properly argues that a "defendant seeks the benefit of a new rule of constitutional law, the court must apply Teague v. Lane before considering the merits of the claim." Caspari v. Bohlen, 510 U.S. 383, 389 (1994).  Under Teague, habeas relief is generally unavailable if it is based "on a rule announced after [a petitioner's] conviction and sentence became final." Id.  Therefore, the court must first ascertain the date on which a petitioner's conviction became final.  Id.  The second step in a Teague analysis is to determine whether a state court considering the contested claim would have felt compelled by existing precedent to conclude that the rule petitioner seeks was required by the Constitution at the time his or her conviction became final.  Id. at 389-90.  Third, if the court determines that a petitioner is seeking relief under a new rule, the court must then decide if that rule falls under one of the two exceptions to Teague. Id. at 390.

The Court must determine whether the decision Petitioner relies upon announces a new rule.  If it does, and if neither Teague exception applies, Petitioner may not rely upon that case. Even if Petitioner does not seek to apply a decision creating a new rule, "it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." Stringer v. Black, 503 U.S. 222, 228 (1992), referencing Butler v. McKellar, 494 U.S. 407, 414-415 (1990).

Respondent asserts that this Court is barred from deciding the merits of Claims 1, 2 and 5, as those three claims propose the creation of new rules of criminal procedure which are barred under Teague.  (Answer to Third Amended Petition ["Ans."] at 22, 27, 31.)  Petitioner disputes Respondent's position, maintaining that these claims are not Teague-barred, and arguing that

1  "[w]hether a rule of law is 'new' is dictated by what the controlling law was at the time

2  Petitioner's state court judgment became final."  (Petitioner's Motion for Summary Adjudication

3  ["Pet. MSA"] at 7.)  Petitioner argues that this Court is bound by Ninth Circuit precedent in

4  applying Supreme Court law, and that Ninth Circuit holdings can create a 'clearly established' rule

5  of law under Teague.

6       Regarding Claims 1 and 2, Petitioner points to the Ninth Circuit holding in United States v.

7  Thompson, 827 F.2d 1254 (9th Cir. 1987), as evidence that those claims do not involve a new rule

8  of law under Teague.  (Pet. MSA at 8-9.)  Petitioner does not make any argument regarding the

9  inapplicability of Teague to Claim 5, instead arguing against the application of Teague to Claim 4.

10  (Id. at 16.)  Respondent does not assert a Teague-bar on Claim 4.

11       The California Supreme Court denied Petitioner's direct appeal on August 28, 2000, and

12  denied rehearing on November 15, 2000.  The United States Supreme Court denied certiorari on

13  May 14, 2001, at which time Petitioner's conviction became final.[2]  Under Teague, Petitioner may

14  not avail himself of a decision announced after his conviction was finalized, or advocate a decision

15  by this court, which creates a new rule of criminal procedure.

16  *1.    Claims 1 and 2*

17       In Claim 1, Respondent maintains that "at the time of his (Petitioner's) trial, there were no

18  clearly established rules of criminal procedure requiring counsel for the defense to be present

19  when a prosecutor sets forth his reasons for peremptorily challenging jurors under Batson v.

20  Kentucky."  (Respondent's Motion to Dismiss ["Resp. MTD"] at 2.)  In Claim 2, Respondent

21  asserts that "at the time of his trial there was no established rule of criminal procedure that a

22  defendant had a right to be personally present when the prosecution provided its reasons for

23  peremptorily challenging a juror under Batson."  (Id. at 19.)  Respondent then aptly asserts that

24  requiring a prosecutor to state these reasons in the presence of defense counsel and the defendant,

25  with the failure to do so constituting structural trial error, creates a new rule of criminal procedure

26  that was not clearly established at the time Petitioner's conviction became final.  (Id. at 12-13, 19-

27  ─────────────

28       [2]Respondent erroneously states the standard, as a "new rule" for Teague purposes is one
    that was established after a petitioner's *conviction became final* and not at the time of his trial.
    Teague, 489 U.S. at 301.

20.)

Petitioner submits that in 1987, well before Petitioner's judgment became final, the Ninth Circuit held that a "district court erred in refusing to allow defense counsel in this case to hear the government's reasons for excluding the black potential jurors and to present argument thereon." (Pet. MSA at 7-9.), citing United States v. Thompson, 827 F.2d 1254, 1261 (9th Cir. 1987).  More recently, however, the Ninth Circuit has noted that it is not "clearly established" whether defense counsel must be permitted to make any argument to rebut the prosecutor's proffered race-neutral reasoning for excluding prospective jurors:

> One can argue that a court must allow defense counsel to present argument during the three-step inquiry, unless the record clearly shows that a decision in the defendant's favor is warranted.  After all, the defendant bears the ultimate burden of persuasion, see Batson, 476 U.S. at 98, 106 S.Ct. at 1712, and has only been allowed to establish a prima facie case before step three.  However, this argument appears not to have been addressed by courts.  Certainly, requiring a court to allow defense counsel to argue is not clearly established law.  Nonetheless, it seems wise for courts to allow counsel to argue, if only to remove some of the burden of record evaluation from the court.

Lewis v. Lewis, 321 F.3d 824, 831 fn.27 (9th Cir. 2003)(emphasis added).  If a defendant does not have a clearly established right to offer a rebuttal to a prosecutor's proffered reasons for exercising a peremptory challenge, it cannot be said that it is clearly established that the defendant and his counsel must be present while the prosecution's proffer is made.

Respondent concedes that under Ninth Circuit precedent, circuit authority can suffice to create a clearly-established rule of law under Teague.  (Resp. MTD at 16); Leavitt v. Arave, 383 F.3d 809, 819 (9th Cir. 2004); Bell v. Hill, 190 F.3d 1089, 1093 (9th Cir. 1999).  Respondent also notes that other circuit courts disagree with the Ninth Circuit on whether circuit authority can create a clearly established rule of law under Teague.  See Soffar v. Cockrell, 300 F.3d 588, 598 (5th Cir. 2002) (en banc).  Petitioner cites no Supreme Court authority in existence as of the date his conviction became final which would have compelled reasonable state jurists to conclude that trial counsel and Petitioner were constitutionally entitled to be present at the Batson inquiry.  In addition, as the Ninth Circuit held in Lewis, the rules Petitioner seeks to apply to the instant case are not clearly established rules of law under Teague.  The proposed rules do not concern private individual conduct nor do they concern procedures implicit in the concept of ordered liberty, and

1  therefore do not fall within either exception to <u>Teague</u>.  Thus, Claims 1 and 2 propose the

2  application of new rules of criminal procedure, and are barred under <u>Teague v. Lane</u>.

3  <u>2.</u>      <u>Claim 5</u>

4          Respondent argues that, "[a]ny requirement that the state court was required for the first

5  time on appeal to allow comparison of the responses of jurors who were allegedly excused on the

6  basis of race with those who were not would amount to a new rule of criminal procedure," and is

7  thus barred under <u>Teague v. Lane</u>.  (Resp. MTD at 24.)  Respondent also argues that " the Ninth

8  Circuit has concluded, at the time of Petitioner's direct appeal, there was no clearly established

9  law <u>requiring</u> a comparative juror analysis on appeal." (<u>Id.</u>); <u>Boyd v. Newland</u>, 393 F.3d 1008,

10  1014-15 (9th Cir. 2004); <u>Kesser v. Cambra</u>, 392 F.3d 327, 342-44 (9th Cir. 2004) (emphasis

11  added).  Petitioner did not initially offer any <u>Teague</u> argument on Claim 5.

12          The Ninth Circuit has held that comparative juror analysis, as outlined in <u>Miller-El v.</u>

13  <u>Dretke</u>, 545 U.S. 231 (2005), merely clarifies the Supreme Court's holding in <u>Batson</u> by offering

14  another potential tool for the courts to utilize in analyzing such claims, and does not establish a

15  new rule of criminal procedure.  <u>Boyd v. Newland</u>, 455 F.3d 897, 904-06 (9th Cir. 2006).  The

16  Ninth Circuit in <u>Boyd</u> rejected the contention that the claims regarding comparative analysis were

17  <u>Teague</u>-barred, and ruled on the merits of the claim.  <u>Id.</u> at 904.  Respondent acknowledged this

18  point in the supplemental briefings ordered by the Court.  (Respondent's Supplemental Briefing

19  "Resp. SB" at 4.)  Thus, Petitioner's Claim 5 argument does not propose the application of a new

20  rule of criminal procedure, and is not barred under <u>Teague v. Lane</u>.

21              ***DISCUSSION OF MERITS OF PETITIONER'S CLAIMS***

22  *1.      Claims 1 and 2  -- the Exclusion of Petitioner and his Counsel from the Wheeler/Batson*

23      *hearings*

24          Notwithstanding the Court's finding that Petitioner's Claims 1 and 2 are <u>Teague</u>-barred,

25  the Court will also discuss the merits of those claims.  Petitioner alleges that the trial court's

26  exclusion of defense counsel from the hearing during which the prosecutor proffered its reasons

27  for exercising peremptory challenges resulted in a "violation of his constitutional rights to an

     adversarial hearing, to assistance of counsel during a critical stage of the proceedings against him,

28  to a reliable determination of his death penalty, and to due process." (Third Amended Petition

1   ["Pet."] at 14.)  Petitioner further alleges that the trial court's exclusion of him personally resulted

2   in a "violation of his constitutional rights to be personally present . . . ."  (Pet. at 21.)

3        A.  Factual Background

4        Jury selection began in Petitioner's case on January 17, 1989.  [2 RT 41.]  The selection

5   process was divided into three phases: screening for hardship, individual sequestered voir dire

6   pursuant to Hovey v. Superior Court, 28 Cal.3d 1 (1998), and general voir dire.  This process took

7   three-and-a-half months.  During the group voir dire, the defense brought three motions pursuant

8   to People v. Wheeler, 22 Cal.3d at 258, California's equivalent to Batson v. Kentucky, 476 U.S. at

9   79, claiming the prosecution was improperly exercising its peremptory challenges against minority

10   prospective jurors on the basis of their race or ethnic background.  [50 RT 6094-97; 6217-18; 51

11   RT 6344-50.]

12        The trial court asked the prosecution to explain its reasons for the challenges.  [50 RT

13   6094-95; 50 RT 6217-18; 51 RT 6344.]  The prosecutor stated he did not wish to reveal his

14   strategy and requested that the court hold an ex parte hearing from which defendant and his

15   counsel would be excluded.  [50-1 RT 6184-86.]  Defense counsel stated that he had no objection

16   to being excluded from discussions of strategy, but that "I think I am entitled to be present"

17   otherwise, in case the prosecution's "statement is a misstatement of the facts" and to "make sure

18   the record is clear as to what the statement of facts is."  [50 RT 6096.]  The court overruled

19   defense counsel's objection and held three ex parte hearings.  Following each hearing, the trial

20   court ruled that the prosecutor was not challenging jury panelists because of race or ethnicity.  [50-

21   1RT 6186; 51-1 RT 6307; 51-1 RT 6358.]

22        B.  The California Supreme Court's Ruling

23        The California Supreme Court denied Petitioner's claim that the trial court erred in

24   excluding him and his counsel from the three ex parte hearings.  The California Supreme Court

25   first laid out the legal standard to be applied in ruling upon a defendant's challenge under Wheeler

26   and Batson.  Ayala, 24 Cal.4th 243, 259-269.

27        "Under Wheeler, there is a presumption that a prosecutor uses his
    peremptory challenges in a constitutional manner. [Citation.] The defendant bears
28   the burden to show, prima facie, the presence of purposeful discrimination.
    [Citation.] If he succeeds, the burden shifts to the prosecutor to show its absence."

- 9 -

(People v. Alvarez (1996) 14 Cal.4th 155, 193 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

> The details of the procedure for conducting an inquiry on a claim of improper group bias against prospective jurors are well known. In the first step of the three-part Wheeler inquiry, "'[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, ... he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association ....'" (People v. Box (2000) 23 Cal.4th 1153, 1187- 1188 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Next, the burden shifts to the challenged party to provide a race-neutral explanation for the exercise of peremptory challenges. (People v. Hayes (1999) 21 Cal.4th 1211, 1284 [91 Cal.Rptr.2d 211, 989 P.2d 645].) At the third step of the Wheeler challenge process -- the determination by the trial court whether the opponent of the peremptory challenge has proved purposeful racial discrimination -- the trial court must consider at least two possibilities. If the prosecutor acknowledges that he challenged a prospective juror for an impermissible reason (see U.S. v. Thompson (9th Cir. 1987) 827 F.2d 1254, 1256, fn. 1), then, of course, the Wheeler motion must be granted. If the prosecutor does not so state, but instead offers the court race-neutral reasons, it must still determine whether those stated reasons are untrue and pretextual. (People v. Alvarez, supra, 14 Cal.4th 155, 196.)

Id. at 260-61.  The California Supreme Court noted that the United States Supreme Court has established no particular procedures which are constitutionally required:

> Provided that the inquiry proceeds within the general framework just articulated, no particular procedures are constitutionally required.  As the United States Supreme Court said of Batson hearings, "It remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice." (Powers v. Ohio (1991) 499 U.S. 400, 416 [111 S.Ct. 1364, 1374, 113 L.Ed.2d 411].) "The response of courts across the country has created a rather wide spectrum, ranging from those that recommend an adversary proceeding of some type to those that permit the prosecutor's explanation to be received in camera and ex parte." (Gray v. State (1989) 317 Md. 250, 257 [562 A.2d 1278, 1281].)

Id. at 261.

The California Supreme Court initially rejected the trial court's implicit ruling that the prosecution's reasons for exercising the peremptory challenges were matters of trial strategy justifying an *ex parte* hearing.  Id. at 262.   The Court further concluded that because no matters of trial strategy were revealed, it was error "as a matter of state law" to exclude defendant from participating in the hearings.  Id.  In finding that the procedure was erroneous under state law, the California Supreme Court relied heavily upon the Ninth Circuit's decision in United States v.

1  Thompson, 827 F.2d 1254 (9th Cir. 1987):

2  The question whether ex parte communications are proper in ruling on a Wheeler motion has not arisen in California decisional law. But the same or closely related issues have arisen in federal and other state cases discussing analogous motions brought under Batson v. Kentucky, supra, 476 U.S. 79. While some decisions have tolerated an ex parte Batson hearing procedure on the ground that the United States Constitution permits it (U.S. v. Tucker (7th Cir. 1988) 836 F.2d 334, 340; U.S. v. Davis (6th Cir. 1987) 809 F.2d 1194, 1202), it seems to be almost universally recognized that ex parte proceedings following a motion regarding peremptory challenges allegedly made on the basis of improper group bias are poor procedure and should not be conducted unless compelling reasons justify them. (People v. Hameed (1996) 88 N.Y.2d 232, 237-238 [644 N.Y.S.2d 466, 469, 666 N.E.2d 1339, 1342]; U.S. v. Roan Eagle (8th Cir. 1989) 867 F.2d 436, 441; Gray v. State, supra, 317 Md. 250, 257-258 [562 A.2d 1278, 1282]; U.S. v. Tindle (4th Cir. 1988) 860 F.2d 125, 132-133 (conc. & dis. opn. of Murnaghan, J.); U.S. v. Garrison (4th Cir. 1988) 849 F.2d 103, 106; U.S. v. Tucker, supra, 836 F.2d at p. 340; U.S. v. Gordon (11th Cir. 1987) 817 F.2d 1538; Goode v. Shoukfeh (Tex. 1997) 943 S.W.2d 441, 452 [civil case].) We agree.

11  U.S. v. Thompson, supra, 827 F.2d 1254, presented the issue and the countervailing values involved: "The question presented to us is ... whether the district judge erred by permitting the [prosecutor] to state her reasons to him ex parte and then ruling on the objection without divulging the reasons to defense counsel. In resolving this issue we must consider and reconcile two fundamental principles of our criminal justice system. The first is that the district judge has broad discretion to fashion and guide the procedures to be followed in cases before him. [Citations.] The second principle is that adversary proceedings are the norm in our system of criminal justice, [citation], and ex parte proceedings the disfavored exception." (Id. at p. 1257.)

16  U.S. v. Thompson, supra, 827 F.2d 1254, further explained: "The right of a criminal defendant to an adversary proceeding is fundamental to our system of justice. [Citations.] This includes the right to be personally present and to be represented by counsel at critical stages during the course of the prosecution. [Citation.] This is not mere idle formalism. Our system is grounded on the notion that truth will most likely be served if the decisionmaker-judge or jury-has the benefit of forceful argument by both sides....

20  "There are, to be sure, occasional departures from this norm. The district judge makes an ex parte review of the prosecution's evidence to determine whether it falls within the rule of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). [Citations.] Also, the district judge normally considers on an ex parte basis whether to reveal to the defense the identity of a government informant. [Citation.] But, as these examples illustrate, situations where the court acts with the benefit of only one side's presentation are uneasy compromises with some overriding necessity, such as the need to act quickly or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema in our system of justice and ... may amount to a denial of due process." (U.S. v. Thompson, supra, 827 F.2d 1254, 1258-1259, fn. omitted.)

26  In addition to the foregoing general considerations, it is error in particular to conduct ex parte proceedings on a Wheeler motion because of the risk that defendant's inability to rebut the prosecution's stated reasons will leave the record incomplete.

1  <u>Ayala</u>, 24 Cal.4th at 262-264.

2       The California Supreme Court found, however, that the state law error, and any federal

3  error that may have occurred, was harmless.  <u>Id</u>. at 268-69.  In concluding that the error was

4  harmless, the Court closely examined the record of the voir dire.  Based upon that review the Court

5  concluded as follows:

6          In summary, the record reveals the following facts in support of the view
   that the prosecutor was not engaged in racial or ethnic discrimination. The court

7  credited the prosecutor's opinions that Olanders D. opposed the death penalty, that
   Barbara S. was in a dazed state, that George S. had been a holdout juror and had

8  been rejected for a law enforcement position, and that Robert M. was less than
   desirable from the prosecution's point of view. Galileo S., among other deficiencies,

9  had (unless the prosecutor was misleading the court) not been honest regarding his
   criminal past. Luis M. admitted that he had investigated the case. Gerardo O.

10  struggled with English and did not understand the proceedings. A prosecution
   committee, including a psychologist, gave Barbara S., George S., and Robert M.

11  poor or mediocre suitability ratings. George S.'s surname is not obviously Spanish,
   and the prosecutor stated that he was unaware of his Hispanic heritage.

12          On these facts, we are confident that the prosecutor was not violating

13  <u>Wheeler</u>, and that defense counsel's presence could not have affected the outcome
   of the <u>Wheeler</u> hearings. [FN3 omitted] Moreover, the trial court's rulings in the ex

14  parte hearing indisputably reflect both its familiarity with the record of voir dire of
   the challenged prospective jurors and its critical assessment of the prosecutor's

15  proffered justifications. To the extent the rulings expressed agreement with the
   prosecutor's characterizations of the prospective jurors and their responses, they

16  also support the court's implicit conclusion that the prosecutor did not fabricate his
   justifications and they were grounded in fact.

17  <u>Id</u>. at 266-67.   The Court recognized the theoretical possibility that exclusion of a defendant from

18  an ex parte <u>Wheeler</u> hearing may result in an incomplete record.  <u>Id</u>. at 267.  The Court found,

19  however, "[o]n this well-developed record . . . we are confident that defense counsel could not

20  have argued anything substantial that would have changed the court's rulings. Accordingly, the

21  error was harmless."  <u>Id</u>. at 268.

22       Finally, the California Supreme Court rejected the contention that the error violated

23  Petitioner's right to be present and to be represented by counsel, finding any federal constitutional

24  error also to be harmless.  <u>Id</u>. at 269.

25      C. Discussion

26       Assuming that Claims 1 and 2 are not <u>Teague</u>-barred, those claims fail on their merits.  In

27  <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the Supreme Court first held that the United States

28  Constitution prohibits a prosecutor from exercising a peremptory challenge solely on the basis of

1   race.  Evaluating whether a peremptory challenge was race-based under <u>Batson</u> is a three-step

2   process, requiring that (1) the defendant must demonstrate a prima facie case that the prosecutor

3   challenged the contested jurors due to their race, (2) if the defense made a prima facie showing of

4   discrimination, the burden shifts to the prosecution to articulate racially-neutral explanations for

5   those challenges, then (3) the trial court must determine if the defendant met his burden of proving

6   purposeful discrimination.  <u>Batson</u>, 476 U.S. at 96-98.  At the final step, the trial court must

7   "evaluat[e] 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate

8   burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of

9   the strike'."  <u>Rice v. Collins</u>, ___ U.S. ___, 126 S. Ct. 969, 974 (2006) (quoting <u>Purkett v. Elm</u>,

10  514 U.S. 765, 768 (1995) (*per curiam*)).

11          The Supreme Court has never suggested the exact manner in which trial courts must gather

12  evidence necessary to make its determination that the exercise of a peremptory challenge was (or

13  was not) motivated by racial animus.  In <u>Batson</u>, the Court specifically left it to the lower courts to

14  "formulate particular procedures to be followed upon a defendant's timely objection to a

15  prosecutor's challenges."  <u>Id.</u>, 476 U.S. at 99 & fn.24.  Seizing upon this language, both the Sixth

16  and Seventh Circuit Courts of Appeals have concluded that a trial court does not err in allowing a

17  prosecutor to explain his or her reasons for exercising a peremptory challenge in an ex parte

18  proceeding outside the presence of the defense.  <u>United States v. Tucker</u>, 836 F.2d 334, 337-40

19  (7th Cir. 1988); <u>United States v. Davis</u>, 809 F.2d 1194, 1201-02 (6th Cir. 1987).  In <u>Tucker</u>, the

20  Seventh Circuit noted that <u>Batson</u> itself "does not require rebuttal of the Government's explanation

21  by defense counsel" nor does it "require the participation of defense counsel . . . ."  836 F.2d at

22  339; <u>see also</u> <u>Davis</u>, 809 F.2d at 1202 ("Once the defendants had established a prima facie case of

23  racial motivation sufficient for the district court to make an inquiry of the Government, there was

24  nothing more defendants were required to do.  Their participation was no longer necessary for the

25  district court to make its determination.")

26          Subsequent to the Sixth and Seventh Circuits decisions, the Supreme Court acknowledged,

27  albeit in dictum, that "[i]n the rare case in which the explanation for a challenge would entail

28  confidential communications or reveal trial strategy, an *in camera* discussion can be arranged."

1   <u>Georgia v. McCollum</u>, 505 U.S. 42, 58 (1992).  Just last year, the Second Circuit again noted that

2   "there also remains doubt whether the defense enjoys the even more rudimentary right to be

3   allowed access to the prosecution's race-neutral explanations in the first place." <u>Majid v.</u>

4   <u>Portuondo</u>, 428 F.3d 112, 128 (2d Cir. 2005).

5        In the face of this authority tending to demonstrate that there is no clearly established

6   federal law prohibiting the trial court from holding *ex parte* <u>Batson</u> proceedings, Petitioner relies

7   upon <u>United States v. Thompson</u>, 827 F.2d 1254 (9th Cir. 1987), as well as the general right of a

8   defendant to be present during critical stages of a felony trial in arguing that he is entitled to relief.

9   In <u>Thompson</u>, the Ninth Circuit noted that "[a]bsent . . . compelling justification, ex parte

10   proceedings are anathema in our system of justice and, in the context of a criminal trial, may

11   amount to a denial of due process." <u>Id</u>. at 1258-59.  The court held that the because the

12   prosecutor's proffered reasons for exercising a peremptory challenge were not strategy-related, the

13   trial court erred in excluding defendant and his counsel from those proceedings.  <u>Id</u>. at 1259.

14   Petitioner in this case also relies upon general authority establishing that voir dire is a critical stage

15   of the felony criminal proceeding, during which the defendant has a right, derived from the

16   Confrontation Clause of the Sixth Amendment, to be present.  <u>Gomez v. United States</u>, 490 U.S.

17   858, 873 (1989) (citing <u>Lewis v. United States</u>, 146 U.S. 370, 374 (1892)).

18        The California Supreme Court concluded that the trial court abused its discretion in finding

19   that the reasons proffered by the prosecutor for exercising the peremptory challenge involved trial

20   strategy.  <u>Ayala</u>, 24 Cal.4th at 262.  The California Supreme Court also concluded that it was an

21   error of <u>state law</u> for the trial court to hold those proceedings *ex parte*.  <u>Id</u>. The California Supreme

22   Court did not, however, express an opinion as to whether the exclusion of Petitioner and his

23   counsel was error of constitutional magnitude.  In light of the express holdings of the Sixth and

24   Seventh Circuits in <u>Tucker</u>, 836 F.2d at 337-40 and <u>Davis</u>, 809 F.2d at 1201-02, the *ex parte*

25   proceedings were not constitutional error, as well as the Supreme Court's acknowledgment in

26   <u>McCollum</u>, 505 U.S. at 58 that *in camera* discussions are sometimes appropriate, the Court doubts

27   whether the trial court's procedure was constitutionally defective as a matter of clearly established

28   Federal law.

1    Even assuming that the trial court erred in hearing the prosecutor's reasons for exercising

2    his peremptory challenges outside of the presence of Petitioner and his counsel, however, the state

3    court's determination that such error was harmless was neither "contrary to [n]or an unreasonable

4    application of clearly established Federal law."  Williams, 529 U.S. at 412-13.  Petitioner argues

5    that exclusion of he and his counsel was structural error, requiring automatic reversal.  Petitioner

6    argues that "where assistance of counsel has been denied entirely or during a critical stage of the

7    proceeding," prejudice is presumed and reversal is required.  Mickens v. Taylor, 535 U.S. 162, 166

8    (2002); United States v. Cronic, 466 U.S. 648, 659 fn.25 (1984).  Petitioner also relies upon the

9    Ninth Circuit's analysis in Thompson, finding the exclusion of defendant and his counsel from the

10   Batson hearing to be *per se* reversible because "[t]he government cannot rely on a transcript

11   reflecting such fundamentally flawed procedures to show that the defendant suffered no

12   prejudice."  Thompson, 827 F.2d at 1261.

13   As an initial matter, the Ninth Circuit's decision in Thompson is materially distinguishable

14   from this case. The prosecutor in Thompson relied in part upon the juror's race as the basis for

15   exercising the peremptory challenge.  Id., 827 F.2d at 1256, fn.1.  In addition, the trial judge in

16   Thompson made no explicit findings on the record regarding the strength or weakness of the

17   prosecutor's proffered reasons.  In this case, the reasons offered by the prosecutor did not contain a

18   hint of racial bias.  The trial judge who had presided over the entire voir dire process was well

19   aware of the standards and made explicit findings on the record evaluating the credibility of the

20   prosecutor's proffered reasons.  Finally, Thompson was a direct appeal of a federal criminal

21   judgment, not a collateral attack on a state court judgment under 28 U.S.C. § 2254, such that

22   different standards of review applied.  For these reasons, the Court finds the Ninth Circuit's

23   decision in Thompson, that exclusion of a defendant or his attorney from an *ex parte* Batson

24   hearing is *per ser* reversible, to be inapplicable to this case.

25   In general, the error alleged by Petitioner here does not fall within the circumstance where

26   per se reversal is required.  The Supreme Court has never held that the exclusion of a defendant

27   from a critical stage of his criminal proceedings constitutes a structural error.  Campbell v. Rice,

28   408 F.3d 1166, 1172 (9th Cir. 2005). "To the contrary, in Rushen v. Spain, 464 U.S. 114, 117

- 15 -

1   (1983) (per curiam), the Court determined that the fact that the defendant was denied the right to

2   be present during an *ex parte* communication between the judge and a juror was trial error subject

3   to harmless error analysis." Campbell, 408 F.3d at 1172.  Furthermore, as Petitioner

4   acknowledges, Mickens holds only that prejudice is presumed where counsel "has been denied

5   entirely or during a critical stage." Id., 535 U.S. at 166.  Petitioner was not completely deprived of

6   counsel during the voir dire in this case.  Therefore, the California Supreme Court's decision that

7   any federal constitutional error in excluding Petitioner and his counsel from the *ex parte* Batson

8   proceedings was subject to harmless error analysis was not contrary to or an unreasonable

9   application of clearly established Federal law.  Williams, 529 U.S. at 412-13.

10          Finally, Petitioner has not shown that the California Supreme Court's decision finding the

11  purported error to be harmless was objectively unreasonable within the meaning of AEDPA.

12  Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (before habeas relief may be granted under AEDPA,

13  federal court must determine that the state court applied the harmless-error review in an

14  "objectively unreasonable" manner).  The California Supreme Court went to great lengths to

15  review the reasons proffered by the prosecution, and the trial court's evaluation of those reasons.

16  Ayala, 24 Cal. 4th at 264-266.  Upon such review, the California Supreme Court concluded that

17  the trial court's exclusion of Petitioner and his counsel from the proceedings "could not have

18  affected the outcome of the [Batson] hearings." Id. at 267.  The California Supreme Court also

19  discussed and distinguished the Ninth Circuit's opinion in Thompson, noting there was nothing in

20  the record to suggest any impropriety in the prosecutor's exercise of his peremptory challenges.

21  Id. at 267-68.

22          The Court has reviewed the record of the voir dire.  As discussed in detail below with

23  regard to Petitioner's Claim 4, the Court finds the prosecutor's proffered non-discriminatory

24  reasons for exercising each of the peremptory challenges was amply supported by the record.  This

25  is not a case where the prosecutor offered patently inappropriate or even marginal reasons for

26  striking the jurors.  The Court finds that the state court's harmless error analysis was not

27  objectively unreasonable.  Petitioner is not entitled to relief on Claims 1 and 2.

28  **2.**      *Claim 4 -- Equal Protection rights of prospective jurors*

Petitioner alleges that the "ex parte, in camera <u>Batson</u> proceedings violated the equal protection rights of the seven minority prospective jurors who were the subjects of those proceedings," resulting in a violation of Petitioner's due process rights.  (Pet. at 23.)  Respondent argues that this claim was rejected on the merits by the California Supreme Court.  (Ans. at 29.)

A.  California Supreme Court's Opinion

In the direct appeal opinion, the state supreme court concluded:

> In tandem with his *Wheeler* claim, defendant also maintains that the ex parte proceedings make it impossible to determine whether race-based exclusion may have occurred, to the detriment of prospective jurors who enjoy a right under the equal protection clause not to be discriminated against in jury selection on the basis of race. (*Powers v. Ohio*, *supra*, 499 U.S. 400, 409, [111 S.Ct. 1364, 1369-1370].) Again, on the record before us, we are confident that no such exclusion occurred. The prosecutor articulated, at a minimum, plausible criteria for his excusals, the trial court agreed that the excusals were proper, and to the extent the written record before us touches on the prosecutor's stated reasons, it confirms that they were not pretextual.

<u>Ayala</u>, 24 Cal.4th at 269.

B.  Discussion

As set forth above, the Supreme Court in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), first held that the United States Constitution prohibits a prosecutor from peremptorily challenging potential jurors solely on the basis of race.  Evaluating whether a peremptory challenge was race-based under <u>Batson</u> is a three-step process, requiring that (1) the defendant must demonstrate a prima facie case that the prosecutor challenged the contested jurors due to their race, (2) if the defense made a prima facie showing of discrimination, the burden shifts to the prosecution to articulate racially-neutral explanations for those challenges, then (3) the trial court must determine if the defendant met his burden of proving purposeful discrimination.  <u>Id.</u>, 476 U.S. at 96-98.

The Supreme Court has also held that a prosecutor's race-based exclusion of jurors can constitute a violation of the Equal Protection rights of those jurors, which a petitioner does have standing to challenge even when the prospective jurors in question do not share racial identity with him or her.  <u>Powers v. Ohio</u>, 499 U.S. 400 (1991).  State law allows for significant trial court discretion and acknowledges that a peremptory challenge may be based on a broad range of evidence intimating juror partiality.  <u>People v. Wheeler</u>, 22 Cal.3d 258, 275 (1978).

Petitioner argues that while the California Supreme Court rejected this claim on direct

- 17 -

1   appeal, the state court's review of the record was "illusory" because it "failed to include

2   participation, and a record made, by the defense." (Pet. MSA at 16.) Petitioner concludes that, as

3   the state supreme court failed to properly apply clearly established federal law, habeas relief

4   should be granted on this claim. (Id.)

5          Respondent maintains that the California Supreme Court "correctly identified and applied

6   Batson," and the state court's decision was not contrary to or an unreasonable application of

7   controlling precedent. (Resp. MTD at 21-22.) Respondent further argues that the trial prosecutor

8   offered specific reasons for challenging each prospective juror in question and the California

9   Supreme Court found those reasons to be race-neutral. (Id. at 22.)

10          State supreme court factual findings are presumed to be correct absent clear and convincing

11   evidence to the contrary. Rice v. Collins, ___U.S.___, 126 S.Ct. 969, 974 (2006); Mitleider v.

12   Hall, 391 F.3d 1039, 1046-48 (9th Cir. 2004). At trial, defense counsel argued that of the seven

13   minority prospective jurors who were the subject of the prosecution's peremptory challenges, that

14   it is "clear that these jurors are not significantly different from the white jurors that the prosecution

15   has chosen to leave on the jury both in terms of their attitudes on the death penalty, their attitudes

16   on the criminal justice system, and their attitudes on the presumption of innocence and burden of

17   proof, that I'm more concerned with generally." [51 RT 6347.] The trial court then stated that this

18   showing "will make a prima facie case of discrimination based on group, and will request a further

19   clarification from the people." [Id.] Then, in an ex parte hearing, the prosecution disclosed to the

20   trial court their reasons for a number of their peremptory challenges.

21          The prosecution stated that their challenge of prospective juror Galileo S. was because they

22   found him to be a "nonconformist person who has had numerous run-in's with the law," who had

23   "three or four more arrests than those that he has told us about," with arrests for drunk driving and

24   drugs among the list. [50 RT 6184-85.] The trial court noted for the record that the information

25   about the additional arrests was "shared with defense counsel prior to group questioning." and also

26   agreed with the prosecution that Galileo S. had "a healthy paranoia, if you will, concerning the

27   justice system." [Id. at 6185.]

28          The prosecution opined that their primary concern with Olanders D. was "his ability to vote

for death during the penalty phase." [Id.]  The prosecution added that "[o]n his questionnaire he indicated that he does not believe in the death penalty. He did indicate that his view had changed over the years." [Id.] The prosecution was also concerned by his "lack of ability to express himself well" and said that his answers "did not make a lot of sense." [Id.]  The court concluded that counsel's observations were "accurate and borne out by the record." [Id. at 6186.]

When the next set of prospective jurors were challenged or accepted, the defense objected, stating that two individuals challenged by the prosecution consisted of "one hundred percent of the jurors of Hispanic extraction that have gotten in the jury box." [50 RT 6217.]  The trial court replied: "Again, I don't think the record at this point is sufficient for a prima facie showing. However, again I'm going to request an independent statement for the record with reference to the people's challenge of both Hispanic jurors." [Id. at 6218.]

The prosecution stated, again during an ex parte hearing, that the challenge of Luis M. was partly due to the fact that "he has had second, or perhaps third thoughts with regards to the death penalty." [51 RT 6305.]  In addition, the prosecution was uncomfortable with the jury including "a person who went out and investigated the case" and "left the military at the rank of E-2, suggesting some sort of misconduct or inability."  [Id.]

The prosecution felt that Gerardo O. was a "standoffish type of individual" and had concerns about the fact that he "indicated to us at the beginning that he was illiterate...and that he therefore had the questionnaire translated to him, so that he could make responses." [Id. at 6306.] The prosecution also noted that Gerardo O. said he was not sure if he could "take someone's life into his hands" and felt "a little shaky" about his responsibilities as a juror in this case. [Id. at 6306-07.]

The prosecution stated that they used a peremptory challenge on George S. [51 RT 6351] for multiple reasons, including the fact that "he was one hold-out" in his prior jury service, that he placed "undue emphasis on the Bible" and opined that "God would punish" those who did wrong and that he "applied and was rejected back in 1969 to be a police officer," which caused them to speculate on the "psychological aspects" of his rejection. [Id. at 6351-52.]  The prosecutor also stated that he was "not aware that he was Hispanic" until the defense protested the peremptory

challenge, as he thought the prospective juror was maybe of "Greek" ancestry. [Id. at 6352-53.]

The prosecutor stated that the challenge of Barbara S. was due to the fact that he "thought there was something wrong" with her, as "her responses were extremely slow," "her answers did not make sense" given the questions asked, and the prosecution suspected she was "possibly under the influence of drugs." [Id. at 6354-55.]  The prosecutor added that he believed Barbara S. appeared "somewhat angry" upon her initial entrance into court, and displayed "a great deal of nervousness." [Id. at 6355.]  The trial court did not agree with the prosecution's characterization of her demeanor, opined that many prospective jurors were nervous, and stated that Barbara S. did not appear to be hostile.  [Id. at 6356.]  However, the court did concur with prosecution's notice of the "incomplete, if you will, answers, non sequiturs." [Id.]

The prosecution stated that they felt reluctance regarding whether Robert M. would actually vote for the death penalty, and were concerned with his interest in "following of the Saigon Penn case." [Id. at 6356-57.]  The prosecution noted that Robert M. said while he believed in the death penalty it would be "hard for him to be involved in the death penalty." [Id. at 6357-58.]  The trial court noted Robert M.'s agreement with the idea of the death penalty, and conceded that the prosecution could have a legitimate concern whether this prospective juror would actually impose it in a case. [Id. at 6358.]

The prosecutor offered credible reasons for challenging the jurors in question, and the trial court concluded that those reasons were sufficient and race-neutral.  The California Supreme Court found no evidence of a due process violation under Powers v. Ohio, based its findings on the record before it, and properly applied controlling federal law.

This Court cannot say the state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law, nor was it based upon an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  As a result, this claim does not entitle Petitioner to habeas relief.

3.     Claim 5 -- Loss of juror questionnaires

Petitioner alleges that the loss of the majority of the juror questionnaires in his case resulted in a violation of his rights to meaningful appellate review, to a reliable penalty

determination, and to due process.  (Pet. at 24.)  Respondent argues that the California Supreme

Court considered this claim and rejected it on the merits, and further asserts that the claim is

"procedurally barred."  (Ans. at 30.)  Respondent initially argued that "Petitioner has not shown

that the claim does not rest upon a new rule barred under <u>Teague v. Lane</u>."  (<u>Id.</u>)

A.  Procedural arguments

Respondent's <u>Teague</u> claim was discussed and rejected above on page 8.  Respondent also

asserts Petitioner's claim 5 is "procedurally barred," because the state supreme court ruled it

would not have engaged in comparative juror analysis between seated and non-seated jurors, and

thus, Petitioner could not have suffered prejudice from the loss of the questionnaires.  (Ans. at 29-

30.)

This Court may decline to render an opinion on the adequacy of procedural default rules

and decide this claim on the merits.  Established precedent in the Ninth Circuit dictates that a

court's decision with respect to evaluating procedural default is to be informed by furthering "the

interests of comity, federalism, and judicial efficiency."  <u>Boyd v. Thompson</u>, 147 F.3d 1124, 1127

(9th Cir. 1998).  Thus, if deciding the merits of a claim proves to be less complicated and less

time-consuming than adjudicating the issue of procedural default, a court may exercise discretion

to take this course of action in its management of the case.  <u>Batchelor v. Cupp</u>, 693 F.2d 859, 864

(9th Cir. 1982), quoted by <u>Boyd</u>, 147 F.3d at 1127.  This is the case here.

B.  California Supreme Court's opinion

The state supreme court denied this claim on direct appeal, concluding:

Defendant claims that his constitutional right to a meaningful review of his
conviction and sentence has been infringed by the loss of the bulk of prospective
juror questionnaires.  The questionnaires of the seated jurors and alternates were
preserved, but almost all others have been lost.

As a general matter, we disagree.  We addressed, and rejected, a similar
claim in *People v. Alvarez*, *supra*, 14 Cal.4th 155, where we said: "[D]efendant
maintains that his *Wheeler*[-]*Batson* claim must be resolved in his favor on the
ground that the record on appeal is not adequate to permit meaningful review.  The
deficiency of which he complains is the absence of certain questionnaires, which
were completed by prospective jurors, then lodged with the superior court,
subsequently lost by its clerk's office, and finally determined by the superior court
to be beyond reconstruction.  A criminal defendant is indeed entitled to a record on
appeal that is adequate to permit meaningful review.  That is true under California
law. [Citation.] It is true as well under the United States Constitution–under the
Fourteenth Amendment generally, and under the Eighth Amendment specifically

1
when a sentence of death is involved.  [Citation.] The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the

2
defendant's ability to prosecute his appeal." (*Id.* at p.196, fn.8.)

3
    With regard to the prospective jurors whose questionnaires were lost but who are not identified by the defendant as the subject of the *Wheeler* challenges:

4
this court will not in any event compare the views of those jurors excused by peremptory challenges with those who were not excused on that basis.  (*People v.*

5
*Jackson* (1996) 13 Cal.4th 1164, 1997 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; cf. *id.* at pp. 1249 (conc. opn. of Mosk, J.) [urging a contrary approach].)  Under this court's

6
precedent, therefore, the loss of the questionnaires could not have prejudiced him. With regard to the prospective jurors whose questionnaires were lost and who were

7
the subject of *Wheeler* challenges, we have already explained that the record is sufficiently complete for us to be able to conclude that they were not challenged

8
and excused on the basis of forbidden group bias.  Thus, even if there was federal error, it was harmless beyond a reasonable doubt (*Chapman v. California*, *supra*,

9
386 U.S. 18, 24, [87 S.Ct. 824, 828]), and under state law any error also was harmless (*People v. Watson*, *supra*, 46 Cal.2d 818, 836).

10
*Ayala*, 24 Cal.4th at 269-70.

11
    Petitioner points out that Chief Justice George dissented from the California Supreme

12
Court's conclusions in *Ayala*, finding the harmless error analysis used by the majority to examine

13
Petitioner's claims to be "suspect."  *Id.* at 295.  Chief Justice George further opined that the court's

14
exclusion of defense counsel and the defendant from the hearings where the prosecutor disclosed

15
his reasons for the peremptory challenges, coupled with the loss of the juror questionnaires,

16
warranted relief.  In the dissent, he wrote:

17
    Further, a remand also would be impracticable and inadequate in this case because the extensive written juror questionnaires of the vast majority of panelists

18
who participated in the general voir dire have been lost and apparently destroyed. Thus, as a result of the trial court's error, we are left with a record that is inadequate

19
for our review and that cannot be reconstructed at this time.  Accordingly, a

20
reversal of the conviction and a remand for a new trial is the only appropriate remedy.

21
*Id.* at 297.

22
    C.  Discussion

23
    Due process requires that the record of proceedings must be sufficient to permit adequate

24
and effective appellate review.  *Griffin v. Illinois*, 351 U.S. 12, 20 (1956).  A criminal defendant

25
has the right to a record on appeal which includes a complete transcript of the proceedings at trial.

26
*Hardy v. United States*, 375 U.S. 277, 279-82 (1964).   Where part of the record is missing, a

27
petitioner must demonstrate prejudice to his or her appeal before relief may be granted.  *United*

28
*States v. Carrillo*, 902 F.2d 1404, 1410 (9th Cir. 1990).  Petitioner maintains that the loss of the

1   juror questionnaires violated his right to a meaningful appellate review consisting of "comparing

2   the responses on the questionnaires of the challenged minority prospective jurors with the

3   responses to those same questions by non minority prospective jurors who were not the subject of

4   peremptory challenges by the prosecution."  (Pet. MSA at 17.)

5          Petitioner relies on the Ninth Circuit holdings in United States v. Alcantar, 832 F.2d 1175

6   (9th Cir. 1987), and the Ninth Circuit's review of that case on appeal of the remand, United States

7   v. Alcantar, 897 F.2d 436 (9th Cir. 1990), to meld the arguments from Claims 1 and 2 with the

8   argument in Claim 5.  In Alcantar, a federal district judge held an *ex parte* hearing to hear the

9   prosecution's reasons for their peremptory challenges, and the Ninth Circuit remanded the matter

10  for the district court to conduct a new hearing, concluding that defense counsel should have been

11  afforded an opportunity to argue that the reasons given by the prosecution for challenging the

12  minority jurors were merely pre-textual.  Alcantar, 832 F.2d 1180.  On remand, the district court

13  found no improper use of peremptory challenges and reaffirmed the conviction.  Alcantar, 897

14  F.2d at 438.  The Ninth Circuit again reversed, ordering a new trial, finding the "passage of time

15  has rendered such a hearing meaningless," and had not served the purposes of allowing the defense

16  an opportunity to challenge the prosecution's reasons and to "preserve a full record on appeal."

17  Alcantar, 832 F.2d at 1180; Alcantar, 897 F.2d at 438.  Petitioner asserts that the same interests

18  were thwarted in this case, as the loss of the jury questionnaires deprived Petitioner of a full record

19  on appeal which would have allowed him to conduct a comparative juror analysis.

20         California courts do not entertain comparative juror analysis for the first time on appeal.

21  People v. Montiel, 5 Cal.4th 877, 909 (1993) ("an appellate court will not reassess good faith by

22  conducting its own comparative juror analysis.")  Federal courts do consider comparative juror

23  analysis a useful tool for analyzing peremptory strikes under federal law, and the Ninth Circuit

24  strongly suggested that the California courts "should" use this tool on appeal.  Boyd, 455 F.3d at

25  906; see also Turner v. Marshall, 121 F.3d 1248, 1251-52 (9th Cir. 1997).  The Ninth Circuit

26  believes that "Supreme Court precedent requires a comparative juror analysis even when the trial

27  court has concluded that the defendant failed to make a prima facie case."  Boyd, 455 F.3d at 907.

28  In this case, the trial court did find that defendant had made a prima facie case, heard the reasons

1   of the prosecutor for challenging the prospective jurors, and concluded that the challenges were

2   not made on an impermissible basis.  In addition, in Boyd, the Ninth Circuit based its reasoning on

3   the fact that the reviewing courts denied the petitioner access to a full voir dire transcript.  Id. at

4   900.  The circumstances between Boyd and the instant case are distinguishable, as this Petitioner

5   has access to the full voir dire transcript and questionnaires from all seated jurors and alternates

6   from his trial.

7        In the recently decided Kesser v. Cambra, ___ F.3d ___, 2006 WL 2589425 (9th Cir.

8   Sept. 11, 2006) (en banc), the Ninth Circuit held that a state prosecutor improperly struck a

9   prospective juror on the basis of race, reversing an earlier decision denying habeas relief.  The

10  Court's majority concluded that while the prosecutor's motive for the peremptory challenge was

11  plausible when considered out of context, once it was considered in comparison with "the

12  background and responses of the jurors who were seated, reveal[ed] the prosecutor's purposeful

13  and plainly racial motives in excusing" the contested prospective jurors.  Kesser, at *9.  The Ninth

14  Circuit concluded that the state court, in refusing to consider comparative evidence in the record

15  before them, made an unreasonable determination of facts in violation of 28 U.S.C. § 2254(d)(2),

16  which warranted reversal of the judgment and a grant of the writ.  Id. at *6.

17       Respondent accurately points out that Claim 5 is not a direct Batson claim, but "involves

18  the sufficiency of the record" after a number of juror questionnaires were lost or destroyed.  (Resp.

19  SB at 4.)  The questionnaires of the seated jurors and alternate jurors were preserved, and the state

20  court's ruling was limited to the impact of the lost questionnaires of challenged and otherwise non-

21  selected jurors.  As such, the nature of Petitioner's comparative analysis claim is strikingly

22  different than the one advocated by the Ninth Circuit in Kesser.  Petitioner alleges prejudice from

23  the loss of the questionnaires of non-serving jurors in his case, as he is unable to make

24  comparisons between the written answers provided in those materials with the prosecutor's stated

25  reasons for striking certain minority jurors from the panel.

26       However, comparative analysis is intended to draw parallels between challenged jurors and

27  those allowed to serve.  Petitioner has access to those materials in the record, in the form of the

28  voir dire transcript, the prosecution's stated reasons for challenging certain jurors, and the

1    questionnaires of the empaneled jurors and alternates.  Comparing the questionnaire answers of

2    non-challenged and non-seated jurors with the jurors who were the subject of the prosecution's

3    peremptory challenges would serve little purpose.  The California Supreme Court held that they

4    "will not in any event compare the views of those jurors excused by peremptory challenges with

5    those who were not excused on that basis" and concluded that the loss of the contested

6    questionnaires did not result in prejudice to Petitioner.  Ayala, 24 Cal.4th at 270.

7            Here, the record on appeal provides a meaningful and effective presentation of Petitioner's

8    claims, and appears sufficient to resolve the contentions presented in his federal habeas petition.

9    The reporter's transcript of jury selection proceedings, available to Petitioner, is 6461 pages in 51

10   volumes and thoroughly recounts the voir dire.  Objections to peremptory challenges, challenges

11   for cause and motions regarding prospective jurors are all contained in the available record.  The

12   trial judge and counsel specifically questioned potential jurors regarding their responses in the

13   questionnaires, thoroughly exploring their ability to serve as a juror in Petitioner's trial.  In

14   addition, the questionnaires of the seated jurors and alternates were preserved for review on

15   appeal. The record in this case does allow a reviewing court to examine whether the prosecution

16   exercised its peremptory challenges in an appropriate manner.

17           It is true that, due to the loss of certain questionnaires, comparisons between challenged

18   juror's answers and non-challenged and non-seated juror's responses cannot be made.  However,

19   the California Supreme Court concluded that the record on appeal was sufficiently complete to

20   conclude that the challenged jurors were not excused due to any constitutionally forbidden

21   reasons.  Ayala, 24 Cal.4th at 269-70.  The state supreme court found that if there was an error in

22   the jury selection proceedings, it was harmless.  Id.

23           It is not mandatory for a state court to engage in comparative analysis of challenged jurors

24   to non-challenged and non-seated jurors, and the failure to do so is not an unreasonable application

25   of, or contrary to, clearly established federal law under 28 U.S.C. § 2254(d)(1).  As a result,

26   Petitioner is unable to demonstrate that the loss of those jury questionnaires violated his rights to

27   meaningful appellate review, to a reliable penalty determination, or to due process, and is not

28   entitled to habeas relief.

4.      Claim 9 -- Prospective Juror Linda J.

Petitioner alleges that "the trial court excluded prospective juror Linda J. [sic] for cause on the ground that her views on the death penalty would substantially impair her ability to perform her duties as a juror," which violated Petitioner's rights to a fair and impartial jury and to due process.  (Pet. at 33.)  Respondent argues that the California Supreme Court considered this claim on direct appeal and rejected it on the merits.  (Ans. at 41.)

A.  California Supreme Court's opinion

The state supreme court did consider this claim on direct appeal, concluding:

> Defendant claims that the Sixth and Fourteenth Amendments to the United States Constitution were violated when the trial court granted the prosecution's motion to excuse a prospective juror for substantially impaired ability to follow the law regarding capital punishment.  (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].)

> "As we [have] explained..., '[w]hen a prospective juror's views about the death penalty "would 'prevent or substantially impair the performance of his [or her] duties as a juror'" [citation], the juror is not impartial and may be challenged "for cause"'" (*People v. Earp* (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15].)  This test applies equally to defense and prosecution challenges.  (*Ibid.*)  As stated, "'if the juror's statements are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding.  If there is no inconsistency, we will uphold the court's ruling if it is supported by substantial evidence. [Citations.]' [Citation.] A juror's bias need not 'be proven with unmistakable clarity. [Citations.]  Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.'" (*People v. Carpenter*, *supra*, 21 Cal.4th 1016, 1035.)

> Linda J's answers were inconsistent.  Initially she testified that she would "find it difficult" to return a verdict of death.  She stated that she went beyond being unsure about imposing the death penalty; rather, "I don't think I'm capable of that."  But she also testified that she favored the death penalty in the abstract, and she hypothesized that the trial might enable her to summon the will to impose it.

> After initially denying the prosecution's challenge for cause on the grounds that Linda J. was "impaired, but not substantially," the trial court later reversed itself, finding that her ability to serve as a juror was substantially impaired.

> Because Linda J.'s answers were inconsistent, but included testimony that she did not think herself capable of imposing the death penalty, we are bound by the trial court's determination that her candid self-assessment showed a substantially impaired ability to carry out her duty as a juror.  There was no violation of any constitutional right.

*Ayala*, 24 Cal.4th at 274-75.

B.  Discussion

The United States Supreme Court has held that a sentence of death cannot be upheld if the jury that imposed or recommended it excluded prospective venirepersons who expressed opinions against the death penalty. Witherspoon v. Illinois, 391 U.S. 510, 522-23 (1968). In 1980, the Supreme Court further held that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45 (1980). The Court later affirmed that the Adams standard was the proper standard by which to evaluate allegations of improper exclusion of prospective jurors. Wainwright v. Witt, 469 U.S. 412, 423 (1985).

Appellate review of a trial court's decision regarding issues arising from juror voir dire is obligatorily deferential, as a "reviewing court, which analyzes only the transcripts from voir dire, is not as well-positioned as the trial court to make credibility determinations." Miller-El v. Cockrell, 537 U.S. 322, 339 (2003). In the instant case, the trial court initially denied the state's challenge for cause and later reversed its own decision, ultimately striking Linda J. for cause based on her views regarding capital punishment. This reversal, on its own, does not allow this court to conclude that the trial court erred. Rather, Petitioner must demonstrate that the state supreme court made an unreasonable determination of facts or applied the law in an unreasonable manner in rejecting this claim on appeal.

Upon initial questioning by the trial court, Linda J. said that she would "find it difficult" to vote for the death penalty. [43 RT 4969.] During questioning by defense counsel, she maintained that she would have no difficulty deciding the guilt or innocence of the defendant [Id. at 4970], but "to say whether a person is going to die, I don't think I'm capable of that." [Id. at 4975.] She conceded that it was "possible" that she could vote for the death penalty if she was placed on the jury, if she was "totally convinced" that it was the right decision. [Id. at 4976, 4979.]

When the prosecutor began inquiring into her views on capital punishment, she stated that "When I just think about it, without listening to-- having to go through the steps getting to it, I would have to say I couldn't do it." [Id. at 4991.] She expanded on this, explaining that if she took it "step by step, probably I could listen and come up with a choice," but that when she considered

the death penalty issue as a whole, she did not think she could impose it. [Id. at 4991-92.] Linda J. repeated her discomfort with the death penalty throughout her juror interview, and only expressed the hope that she could "possibly" develop an ability to impose the death penalty after sitting through the trial as a juror. [Id. at 4994-95.]

The trial court initially rejected the prosecutor's challenge for cause, stating that "I think Linda J. [sic] is impaired, but not substantially." [Id. at 4998.]  The court opined that, regarding a decision on the death penalty, that "she [Linda J.] probably can do it." [Id. at 4999.]  The trial court later reconsidered the state's motion in support of a challenge for cause of Linda J. on the basis of briefs submitted by both the prosecutor and defense counsel. [48 RT 5748.]  Both parties declined further oral argument on the subject, and the trial court ultimately decided that Linda J. was in fact "substantially impaired" on the penalty issue and granted the challenge for cause.  [Id. at 5784-85.]

The Supreme Court has stated that in conducting juror interviews,

> [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.  Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.  For reasons that will be developed more fully *infra*, this is why deference must be paid to the trial judge who sees and hears the juror.

Witt, 469 U.S. at 425-26, footnote omitted.

The Supreme Court has opined that a trial judge's "power of observation often proves the most accurate means of ascertaining the truth."  Witt, 469 U.S. at 434.  Contrary to Petitioner's assertions, the Court finds substantial support for the conclusions reached by both the trial court and the state supreme court in determining that Linda J. was "substantially impaired" in her ability to perform as juror due to her views on the death penalty.  Witt, 469 U.S. at 433.

The California Supreme Court's determination that the trial judge did not commit error in excusing Linda J. was not contrary to or an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  Petitioner is not entitled to habeas relief on this claim.

1    ***EVIDENTIARY HEARING STANDARD***

2         In his Reply, Petitioner argues that if the Court does not grant his Motion for Summary

3    Adjudication, then in the alternative an evidentiary hearing should be granted.  (Pet. Reply at 8.)

4    Respondent notes that, in Petitioner's Group Two Motion for Summary Adjudication, Petitioner

5    himself asserted that there were no genuine issues of material fact, and he was thus entitled to

6    summary adjudication on the Group Two claims.  (Id., citing Pet. MSA at 1.)  Respondent

7    maintains that the instant case is therefore controlled by 28 U.S.C. § 2254(d)(2), not 28 U.S.C. §

8    2254(e).  At oral arguments on the Group Two claims, Petitioner explained to the Court that he

9    exercised an abundance of caution in requesting an evidentiary hearing but did not himself believe

10   that any further facts could be discovered on the Group Two claims.

11        Generally, the standard for granting an evidentiary hearing requires Petitioner to make a

12   showing he is entitled to habeas relief.

13            A habeas petitioner is entitled to an evidentiary hearing as a matter
     of right on a claim where the facts are disputed if two conditions are

14   met: (1) where the petitioner's allegations would, if proved, entitled
     him to relief; and (2) the state court trier of fact has not, after a full

15   and fair hearing, reliably found the relevant facts.

16   Rich v. Calderon, 187 F.3d 1064, 1067-68 (9th Cir. 1999); Correll v. Stewart, 137 F.3d 1404, 1411

17   (9th Cir. 1998).  The first prong is typically referred to as the requirement of asserting a "colorable

18   claim."  Siripongs v. Calderon, 35 F.3d 1308, 1310 (9th Cir. 1994).  To properly assert a

19   "colorable claim," a petitioner is "required to allege specific facts which, if true, would entitle him

20   to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998).

21        A petitioner is entitled to an evidentiary hearing if the second prong is met through a

22   showing that:

23            (1) the merits of the factual dispute were not resolved in the state hearing; (2) the
     state factual determination is not fairly supported by the record as a whole; (3) the

24   fact-finding procedure employed by the state court was not adequate to afford a full
     and fair hearing; (4) there is a substantial allegation of newly discovered evidence;

25   (5) the material facts were not adequately developed at the state-court hearing; or
     (6) for any reason it appears that the state trier of fact did not afford the habeas

26   applicant a full and fair hearing.

27   Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled in part, Keeney v. Tamayo-Reyes, 504

28   U.S. 1 (1992).  When a petitioner is able to establish a colorable claim for relief, did not fail to

develop the facts surrounding his claim, and was never given a state hearing on the claim, the district court must conduct an evidentiary hearing.  Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005), quoting Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).

In addition to being entitled an evidentiary hearing as of right when the petitioner presents colorable allegations and the state court has not reliably found the relevant facts through no fault of the petitioner, a federal court retains discretionary authority to conduct an evidentiary hearing. Id. at 318; Seidle v. Merkle, 146 F.3d 750, 753 (9th Cir. 1998).

The AEDPA further limits a district court's decision to conduct evidentiary hearings in § 2254 proceedings. See 28 U.S.C. § 2254 (e)(2); see Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1171 n.4 (9th Cir. 2003).  Section 2254(e) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that:
>
> (A) the claim relies on:
> (I)   a new rule of constitutional law, made retroactive to cases on collateral review by th Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e) (West. Supp. 2005).

As stated above, the standard for granting an evidentiary hearing requires Petitioner to make a showing he is entitled to relief if the facts alleged can be proven.  Petitioner has failed to do so.  Petitioner has not shown that any of these claims rely on either a new rule of constitutional law or a factual predicate that could not have been previously discovered through due diligence. See 28 U.S.C. § 2254 (e)(2).

Accordingly, Petitioner is not entitled to an evidentiary hearing.

**IT IS SO ORDERED.**

**DATED:  October 23, 2006**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**