1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11

HECTOR JUAN AYALA,

12

                                    Petitioner,

13

        vs.

14

15

ROBERT L. AYERS, JR., Warden of the
California State Prison at San Quentin,

16

                                    Respondent.

17

CASE NO. 01cv1322-IEG(PCL)

**Order Denying Petitioner's Motion
for Summary Adjudication on
Group 5 Claims [Doc. No. 213];
Granting Respondent's Motion for
Summary Adjudication on Group 5
Claims [Doc. No. 210]**

18    Petitioner Hector Juan Ayala and Respondent Steven Ornoski have moved for summary

19  adjudication on Petitioner's Group 5 claims which include Grounds 22-25 of his Third Amended

20  Petition.  The parties have filed opposition and reply briefs.

21    A hearing was held before Chief Judge Irma E. Gonzalez on June 8, 2007.  Tiffany Salayer

22  appeared on behalf of Petitioner.  Steven Oetting of the California Attorney General's Office

23  appeared on behalf of Respondent.  Upon consideration, the Court DENIES Petitioner's motion for

24  summary adjudication and GRANTS Respondent's motion for summary adjudication on the

25  Group 5 claims.

26                                    ***OVERVIEW***

27    By an amended information filed on January 20, 1987, Petitioner Hector Juan Ayala

28  ("Petitioner") and his brother Ronaldo Medrano Ayala were charged with the murders of Jose Luis

Rositas, Marcos Antonio Zamora and Ernesto Dominguez Mendez. The information alleged that the murders were committed on or about April 26, 1985, during a robbery attempt where the brothers held four men captive in an automobile repair shop. Both men were also charged with the attempted murder of Pedro Castillo, who was shot during the drug-related robbery attempt, but who escaped and survived. At trial, the prosecution also presented evidence that a third man, Jose Moreno, helped in the commission of these crimes. Castillo provided the information to police that led to the arrests and was the key prosecutorial witness at trial.

Petitioner was convicted on August 1, 1989, of three counts of first-degree murder in violation of California Penal Code ("Cal. Penal Code") § 187, one count of attempted murder in violation of Cal. Penal Code §§ 664 and 187, and one count of robbery and three counts of attempted robbery in violation of Cal. Penal Code §§ 664 and 211--each count with findings that Petitioner used a firearm in the commission of the crimes in violation of Cal. Penal Code § 12022.5. Petitioner was also found guilty of the two special circumstance allegations, multiple murder under Cal. Penal Code § 190.2(a)(3), and murder in the attempted commission of a robbery under Cal. Penal Code § 190.2(a)(17)(1). The jury returned a verdict of death for each of the three murders on August 31, 1989, and the court entered judgment in accordance with the verdict on November 30, 1989.

Petitioner filed his opening brief on automatic appeal to the California Supreme Court on April 23, 1998, raising nineteen (19) separate issues. The California Supreme Court denied the appeal on August 28, 2000. People v. Ayala, 24 Cal.4th 243 (2000). On November 15, 2000, the state court denied the petition for rehearing. On March 15, 2001, Petitioner filed a Writ of Certiorari with the United States Supreme Court, which was denied on May 14, 2001. On May 14, 2001, his judgment became final.

On August 9, 1999, Petitioner filed a habeas petition with the California Supreme Court, raising three (3) grounds for relief. Petitioner was not granted an evidentiary hearing on those claims and his petition was summarily denied on the merits on August 30, 2000.

On July 20, 2001, Petitioner filed a request for appointment of counsel to handle his federal habeas petition. Petitioner filed an initial petition in this Court on May 14, 2002. After later filing

a Second Amended Petition in this Court on December 13, 2002, Petitioner filed a second state habeas petition in the California Supreme Court on March 17, 2003.  The state petition was filed in order to exhaust several unexhausted claims.

Petitioner filed his Third Amended Petition with this Court on December 9, 2004.  On April 11, 2006, the Court denied Petitioner's request for summary adjudication and/or an evidentiary hearing regarding Petitioner's Group 1 Claims (Claims 12 and 13) and granted Respondent's motion for summary adjudication of those claims.  On October 23, 2006, the Court denied Petitioner's request for summary adjudication and/or an evidentiary hearing on the Group Two Claims (Claims 1, 2, 4, 5, and 9) and granted Respondent's motion to dismiss those claims.  On December 6, 2006, the Court denied Petitioner's request for summary adjudication and/or an evidentiary hearing on the Group Three Claims (Claims 6, 7, 8, 10 and 11) and granted Respondent's motion to dismiss those claims.  On December 19, 2006, the Court denied Petitioner's motion for reconsideration of the Order on Group Two Claims (Claim 5).  On March 15, 2007, the Court denied Petitioner's request for summary adjudication and/or an evidentiary hearing on the Group Four Claims (Claims 14, 15, 16, 17, 19, 20, and 21) and granted Respondent's request for summary adjudication on those claims.

### ***STANDARD OF REVIEW***

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

In Lindh v. Murphy, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") "generally apply only to cases filed after the Act [AEDPA] became effective."  In capital habeas actions, cases are typically commenced by the filing of requests for appointment of counsel and stays of execution of the petitioners' death sentences.  Petitioner filed his request for appointment of counsel and stay of execution on April 27, 2001 and filed his petition with this Court on May 6,

1   2002.  The AEDPA became effective on April 24, 1996, when the President signed it into law.

2   See id.  Accordingly, the AEDPA applies to this case.

3

4       Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d),

5   which now reads:

6       (d) An application for a writ of habeas corpus on behalf of a person in custody
        pursuant to the judgment of a State court shall not be granted with respect to any
7       claim that was adjudicated on the merits in State court proceedings unless the
        adjudication of the claim-
8           (1)  resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
9           determined by the Supreme Court of the United States; or
                (2) resulted in a decision that was based on an unreasonable
10          determination of the facts in light of the evidence presented in the
            State court proceeding.
11  28 U.S.C.A. § 2254(d)(1)-(2) (West 2006).

12      A decision is "contrary to" clearly established law if it fails to apply the correct
        controlling authority, or if it applied the controlling authority to a case involving
13      facts materially indistinguishable from those in a controlling case, but nonetheless
        reaches a different result.  See Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct.
14      1495, 146 L.Ed.2d 389 (2000).  A decision involves an "unreasonable application"
        of federal law if "the state court identifies the correct governing legal principle ...
15      but unreasonably applies that principle to the facts of the prisoner's case."  Id.

16  Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

17      Even when the federal court undertakes an independent review of the record in the absence

18  of a reasoned state court decision, the federal court must "still defer to the state court's ultimate

19  decision."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  If the state court decision does

20  not furnish any analytical foundation, the review must focus on Supreme Court cases to determine

21  "whether the state court's resolution of the case constituted an unreasonable application of clearly

22  established federal law."  Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2001).  Federal courts

23  also look to Ninth Circuit law for persuasive authority in applying Supreme Court law and to

24  determine whether a particular state court decision is an "unreasonable application" of Supreme

25  Court precedent.  Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

26      Petitioner does not, in any of his filings on the Group Five Claims, request an evidentiary

27  hearing.  Respondent does contest any potential request for an evidentiary hearing, asserting that

28  these claims are controlled by the "unreasonable determination" standard of 28 U.S.C. 2254(d)(2).

1   The standard for granting an evidentiary hearing requires Petitioner to make a showing he

2   is entitled to relief if the facts alleged can be proven.  Petitioner has not made any attempt to show

3   that any of these claims rely on either a new rule of constitutional law or a factual predicate that

4   could not have been previously discovered through due diligence.  See 28 U.S.C. 2254 (e)(2).

5   Accordingly, Petitioner is not entitled to an evidentiary hearing.

6   ***TEAGUE v. LANE***

7   The United States Supreme Court, addressing perceived inconsistencies in its prior rulings

8   regarding retroactive application of its decisions, held that "new" constitutional rules of criminal

9   procedure will not be applied retroactively to cases on collateral review unless they fall within two

10   narrow exceptions.  Teague v. Lane, 489 U.S. 288, 310-311 (1989).  A new rule is one that "breaks

11   new ground or imposes a new obligation on the States or the Federal Government" or one whose

12   "result was not dictated by precedent existing at the time defendant's conviction became final."

13   Id. at 301.  The two exceptions to the Teague rule are: (1) rules placing certain kinds of private

14   individual conduct beyond the power of the criminal law to prohibit, and (2) procedures implicit in

15   the concept of ordered liberty without which the likelihood of an accurate conviction is seriously

16   diminished.  Id., at 311;  Penry v. Lynaugh, 492 U.S. 302, 305 (1989); Graham v. Collins, 506

17   U.S. 461, 478 (1993).

18   When the state properly argues that a "defendant seeks the benefit of a new rule of

19   constitutional law, the court must apply Teague v. Lane before considering the merits of the

20   claim."  Caspari v. Bohlen, 510 U.S. 383, 389 (1994).  Under Teague, habeas relief is generally

21   unavailable if it is based "on a rule announced after [a petitioner's] conviction and sentence

22   became final."  Id.  Therefore, the court must first ascertain the date on which a petitioner's

23   conviction became final.  Id.  The second step in a Teague analysis is to determine whether a state

24   court considering the contested claim would have felt compelled by existing precedent to conclude

25   that the rule petitioner seeks was required by the Constitution at the time his or her conviction

26   became final.  Id. at 389-90.  Third, if the court determines that a petitioner is seeking relief under

27   a new rule, the court must then decide if that rule falls under one of the two exceptions to Teague.

28   Id. at 390.  Even if Petitioner does not seek to apply a decision creating a new rule, "it is necessary

to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent."  Stringer v. Black, 503 U.S. 222, 228 (1992), referencing Butler v. McKellar, 494 U.S. 407, 414-15 (1990).

In the Answer to the Third Amended Petition, Respondent asserts that this Court is barred from deciding the merits of each of the Group Five claims due to the decision in Teague v. Lane. However, in the arguments on Claims 24 and 25, Respondent's assertion of a Teague bar is limited to a generalized contention that "Petitioner fails to show that the claim does not rest upon a new rule barred under Teague v. Lane, 489 U.S. at 288."  [Answer to Third Amended Petition ("Ans.") at 83, 85.]  In the cross-motions Respondent asserts that Claims 22 and 23 are barred under Teague, and mounts detailed arguments in support of those contentions.

As to Claims 24 and 25 , the Ninth Circuit has articulated its view on the duties placed on the state to properly raise and plead a claim made under Teague.  That court has held:

> If a state seriously wishes to press Teague upon us, at a minimum Teague should be identified as an issue (indeed the first issue) on appeal, the new rule of constitutional law that falls within its proscription should be articulated, the reasons why such a rule would not have been compelled by existing precedent should be explained with particular reference to the appropriate universe of precedent, and an argument should be made why the rule contended for is not within one of Teague's exceptions.

Arredondo v. Ortiz, 365 F.3d 778, 781-782 (9th Cir. 2004).

Respondent has not met his burden of properly raising and pleading a Teague bar for Claims 24 or 25.  Thus, the court's Teague analysis will only concern Claims 22 and 23, for which Teague was properly pled in the cross-motions for summary adjudication.

The California Supreme Court denied Petitioner's direct appeal on August 28, 2000, and denied rehearing on November 15, 2000.  The United States Supreme Court denied certiorari on May 14, 2001, at which time Petitioner's conviction became final.

*1.*    *Claim 22*

In claim 22, Petitioner asserts the trial court erred in allowing evidence of his prior unadjudicated offenses as aggravating factors in the penalty phase proceedings. [Third Amended Petition ("TAP") at 61-65.]  Respondent contends that the claim is "Teague-barred to the extent he argues that a jury must find the existence of aggravating factors under Ring v. Arizona, 536 U.S.

1   584, 609 (2002)."  [Respondent's Motion to Dismiss ("Resp. MTD") at 2.]  Respondent also

2   argues Petitioner is barred by <u>Teague</u> from relying upon <u>Cunningham v. California</u>, ___ U.S. ___,

3   127 S. Ct. 856 (2007).  [Resp. Reply at 4.]

4          The Supreme Court issued the decision in <u>Ring</u>, which announced that a jury, not a judge,

5   must find the existence of aggravating factors unanimously and beyond a reasonable doubt on June

6   24, 2002, at which time Petitioner's conviction had been final for over a year.  Under <u>Teague</u>,

7   habeas relief may not be granted based on a rule that was announced after a petitioner's conviction

8   became final.  <u>Caspari</u>, 510 U.S. at 589.  However, Petitioner asserts that "Respondent fails to

9   consider that the decision in <u>Ring</u> was based on the Supreme Court's decision in <u>Apprendi v. New</u>

10  <u>Jersey</u>, 530 U.S. 466 (2000)," which was decided before Petitioner's case was final, and which

11  held that any fact other than that of a prior conviction that increases the penalty beyond the

12  statutory maximum must be submitted to a jury and proven beyond a reasonable doubt.

13  [Petitioner's Opposition to Respondent's Motion to Dismiss ("Pet. Opp.") at 3.]  The Supreme

14  Court has held that the application of established legal principles to a new set of facts does not

15  create a new rule of law.  <u>Stringer v. Black</u>, 503 U.S. 222, 229-232 (1992).  Thus, Petitioner

16  asserts that as <u>Ring</u> is merely an application of <u>Apprendi</u> to a new set of facts, it did not constitute

17  a new rule of law, and its application to his case cannot be barred under <u>Teague</u>.  [Pet. Opp. at 3.]

18         However, in <u>Schriro v. Summerlin</u>, 542 U.S. 348 (2004), the Supreme Court specifically

19  considered this question, and ruled that their decision in <u>Ring v. Arizona</u> did announce a new rule

20  of criminal procedure, and that the application of that rule was not retroactive to cases already

21  final on direct appeal.  <u>Schriro</u>, 542 U.S. at 358.  The Court's decision to classify <u>Ring</u> as a new

22  rule of criminal procedure precludes Petitioner's argument that <u>Ring</u> was only an application or

23  extension of <u>Apprendi</u> to a new set of facts.

24         Similarly, Petitioner is precluded from relying on the Supreme Court's decision in

25  <u>Cunningham</u>, 127 S.Ct. 826 (2007), as that decision was rendered well after Petitioner's

26  conviction was finalized.  The Ninth Circuit has previously held the United States Supreme

27  Court's decision in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), announced a new rule of criminal

28  procedure that did not apply retroactively to convictions that became final prior to its publication.

1  See Schardt v. Payne, 414 F.3d 1025, 1027 (9th Cir. 2005).  The Supreme Court's recent decision

2  in Cunningham applied Blakely's reasoning to the California determinate sentencing scheme.  See

3  Cunningham, 127 S.Ct 826.  Accordingly, the Cunningham decision announced a new rule of

4  criminal procedure, one which is not a "watershed" rule, and thus cannot be applied retroactively

5  to Petitioner's conviction.  Petitioner is barred under Teague v. Lane from relying on the Supreme

6  Court's decisions in Ring v. Arizona and Cunningham v. California.  The Court will not consider

7  Ring or Cunningham in its evaluation of the merits of Claim 22.

8  **2.**      *Claim 23*

9        In claim 23, Petitioner asserts a due process violation arising from the 13 year delay in

10  presenting evidence of the Maytorena stabbing at the penalty phase proceedings in his case.  [TAP

11  at 65-68.]  Respondent contends "there is no existing rule of criminal procedure foreclosing the

12  use of such penalty phase evidence based on delay."  [Resp. MTD at 5.] Respondent further

13  maintains that the Supreme Court's decision in United States v. Marion, 404 U.S. 307 (1971),

14  relied upon by Petitioner, does not apply to the "presentation of mere evidence" and thus Petitioner

15  is advocating a decision that would involve announcing a new rule of criminal procedure which

16  would be barred under Teague.  [Respondent's Opposition to Petitioner's Motion for Summary

17  Judgment ("Resp. Opp.") at 6-7.]  Petitioner asserts that Respondent has "reduced Petitioner's

18  claim to an excessive level of specificity in order to assert the Teague bar."  [Pet. Opp. at 5.]

19  Petitioner maintains that "[i]t is well-established that a pre-accusation delay may give rise to a due

20  process claim."  [Id.]

21        As the United States Supreme Court decided Marion well before the date when Petitioner's

22  conviction became final and thus did not announce a new rule in issuing that decision, this Court's

23  inquiry changes and "it is necessary to inquire whether granting the relief sought would *create a*

24  *new rule* because the prior decision is applied in a novel setting, thereby extending the precedent."

25  Stringer v. Black, 503 U.S. 222, 228 (1992) (emphasis added).

26        In Marion, the Supreme Court considered the significance, for constitutional purposes, of a

27  lengthy pre-indictment delay, holding that proof of actual prejudice to the defense would make a

28  due process claim of this ilk determinable on the merits.  Id., 404 U.S. at 326.  Petitioner is

exhorting this Court to apply <u>Marion</u> to the prosecution's introduction in evidence of an unadjudicated crime during the penalty phase of his trial, claiming that "[t]he lengthy delay in the prosecution of the assault on Maytorena caused Petitioner to suffer actual prejudice and violated his eighth and fourteenth amendment rights." [Pet. MSA at 11.]

Petitioner argues "[d]uring the penalty phase, evidence is presented from both parties in an adversarial setting. Each juror is instructed to disregard evidence of other crimes unless they find defendant guilty of that crime "beyond a reasonable doubt." If a juror is satisfied the prosecution has met the requisite burden of proof, evidence of other crimes subjects the defendant to enhanced punishment. Thus, by its very nature, the penalty phase involved a substantive trial on the prior unadjudicated crime(s) and is not solely a sentencing hearing relating to the crime(s) charged." [Pet. Opp. at 8.]

Notwithstanding Petitioner's novel argument, the penalty phase of a criminal trial is not the equivalent of a criminal prosecution for the purposes of this due process analysis. Evidence of prior unadjudicated conduct is admitted during the penalty phase not to impose punishment for that conduct, but to give the penalty phase jury "a true picture of the defendant's history since there is no temporal limitation on evidence in mitigation offered by the defendant." <u>People v. Jennings</u>, 46 Cal.3d 963, 982 (Cal. 1988). The jury is rendering a sentence based on the crimes adjudicated during the guilt phase, and the unadjudicated crimes serve as factors in that sentencing decision, not as separate crimes charged to which the jury will render a verdict and sentence.

The application of <u>Marion</u> to evidence presented in the penalty phase of a trial would "impose[] a new obligation on the State or the Federal Government," and does run adverse to the United States Supreme Court's decision in <u>Teague</u>. <u>Id.</u> at 301. Granting Petitioner relief on Claim 23 would result in the creation of a new rule of criminal procedure which does not fall under either of the exceptions to <u>Teague</u>, thus Claim 23 is barred.

### ***DISCUSSION OF MERITS OF PETITIONER'S CLAIMS***

The Group Five claims involve allegations of trial court errors and constitutional deficiencies in the California death penalty statute. Petitioner moves for summary adjudication on the Group Five claims. Respondent moves for summary adjudication on all of the Group Five

1   claims.

2   *1.*      *Claim 22*

3        Petitioner alleges that the trial court erroneously allowed introduction of prior

4   unadjudicated offenses as factors in aggravation in the penalty phase of his trial in violation of his

5   right to a fair and impartial jury trial, due process, equal protection, and a reliable determination of

6   his death sentence.  [TAP at 61-65.]

7        A.  California Supreme Court's opinion

8        The state supreme court considered this claim on direct appeal, concluding:

9             Jury unanimity is not required to establish the truth of unadjudicated
             crimes. (*People v. Carpenter*, *supra*, 21 Cal.4th 1016, 1061.)

10   <u>Ayala</u>, 24 Cal. 4th at 287.

11        B.  Discussion

12        As explained above, Petitioner cannot rely upon <u>Ring v. Arizona</u> or <u>Cunningham v.</u>

13   <u>California</u> with regard to his Claim 22 because of the limitations imposed by <u>Teague</u>. As a result,

14   in evaluating Petitioner's argument, the Court will rely upon authority prior to <u>Ring</u> to determine

15   whether the California Supreme Court's decision denying Petitioner's claim was "contrary to or an

16   unreasonable application of clearly established federal law."

17        The jury was instructed, with regard to its ability to consider evidence of Petitioner's prior

18   unadjudicated offenses as aggravating factors, as follows,

19             Evidence has been introduced for the purpose of showing that Hector Ayala
20          committed the following criminal acts: (A) robbery at the Picnic 'N Chicken in
             violation of Penal Code section 211 on March 28, 1975, (B) assault with a deadly
21          weapon on Robert Maytorena in violation of Penal Code section 245(a)(1), and
             personally using a dangerous or deadly weapon in the commission of said crime on
22          August 25th, 1976, (C) murder of Jessie Apodaca in violation of Penal Code section
             187, and personally using a dangerous or deadly weapon in the commission of said
23          crime in violation of Penal Code section 12022(b) on September 6th, 1982; which
             involved the express or implied use of force or violence, or the threat of force or
24          violence.  *Before you may consider any of such criminal acts as an aggravating*
             *circumstance in this case, you must first be satisfied beyond a reasonable doubt*
25          *that Hector Ayala did, in fact, commit such criminal acts.*

26   [106 RT 13375-13376 (emphasis added).]  The jury was not, however, required to make special

27   findings with regard to the prior unadjudicated offenses, demonstrating they found Petitioner

28   guilty beyond a reasonable doubt of each of those offenses.  As a result, Petitioner argues any one

juror may have considered evidence of one or both of the unadjudicated offenses as factors in aggravation, justifying imposition of the death penalty, without any unanimity as to whether he committed those prior offenses.

Petitioner argues the Sixth Amendment requires the jury find a special circumstance allegation to be true.  Petitioner argues the jury must also find one or more aggravating circumstances (a) exist; (b) outweigh the mitigating circumstances; and (c) are so substantial in comparison with the mitigation as to make death the appropriate penalty.  Cal. Penal Code § 190.3.  Petitioner argues, based upon <u>Ring</u>, <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) and <u>Blakely v. Washington</u>, 542 U.S. 296 (2004) that the jury must unanimously make each of the § 190.3 findings.  Petitioner argues the jury could not consider any of the evidence of the unadjudicated offenses as factors in aggravation unless they first unanimously determined beyond a reasonable

Because Petitioner cannot rely upon <u>Ring</u>, the question is whether the California Supreme Court's decision not to extend <u>Apprendi</u> to the facts and circumstances alleged by Petitioner in Claim 22 was contrary to clearly established federal law.  In <u>Apprendi</u>, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  While the Supreme Court invalidated the New Jersey statute at issue, it also expressly distinguished <u>Walton v. Arizona</u>, 497 U.S. 639, 647-49 (1990), which upheld the trial judge's determination of the ultimate penalty of death, rather than life imprisonment, based upon facts beyond those proven to the jury.  <u>Apprendi</u>, 530 U.S. at 496-97.  The issue resolved in <u>Apprendi</u> was whether the judge, as opposed to the jury, must find the facts supporting imposition of the death penalty.

The claim asserted by Petitioner, that the jury must unanimously find him guilty of the prior unadjudicated offenses before it considers any of the evidence in its penalty phase deliberations, was not clearly established prior to the Supreme Court's decision in <u>Ring</u>.  In <u>Ring</u>, the Supreme Court reversed <u>Walton</u> and held that the Sixth Amendment requires the jury, rather than the judge, to find the existence of aggravating factors supporting imposition of the death penalty.  The Supreme Court in <u>Schriro</u> acknowledged the decision in <u>Ring</u> "altered the range of

01cv1322

permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment." Schriro, 542 U.S. at 353.

Even under the Supreme Court's decision in Ring, Petitioner is not entitled to relief. The Supreme Court in Ring held that the Sixth Amendment requires the jury, not the trial judge, to make findings of the existence of aggravating factors supporting imposition of the death penalty. That holding has nothing to with the much more narrow claim now raised by Petitioner – whether the constitution requires the jury to unanimously find a defendant is guilty beyond a reasonable doubt of any alleged prior unadjudicated offenses before such evidence can be considered by the jury in its penalty phase deliberations. Neither Apprendi, Ring, Cunningham nor any of the other authorities relied upon by Petitioner require such a procedure be implemented in a death penalty jury proceeding under the Sixth and Fourteenth Amendments.

Finally, Petitioner asserts the admission of prior unadjudicated offenses evidence in the penalty phase of a capital trial violates equal protection because the same type of evidence is excluded in sentencing in non-capital cases. [Petitioner's Opposition, p. 7.] Petitioner, however, cites no authority for the proposition such evidence cannot be admitted in a noncapital case. Petitioner points to Cal. Penal Code §§ 1158 and 1158a which require special findings before a sentencing enhancement can be imposed. These statutes have nothing to do with the admissibility of prior unadjudicated offenses or the manner in which those offenses may be considered by the jury during the penalty phase of a trial. Petitioner is not entitled to relief on claim 22.

**2.**     *Claim 23*

Petitioner alleges the 13-year delay in the prosecution of the prior unadjudicated prison stabbing of Robert Maytorena was prejudicial and therefore Petitioner was unlawfully sentenced in violation of his right to due process and to a reliable determination of his death sentence. [TAP at 65-68.]

A.  California Supreme Court's opinion

The state supreme court considered this claim on direct appeal, concluding:

The delay in presenting evidence of unadjudicated crimes did not amount to a stale prosecution (*People v. Ayala*, *supra*, 23 Cal.4th 225, 300) or violate any statute of

1    limitations (*People v. Carpenter*, *supra*, 21 Cal.4th at p. 1061).

2    Ayala, 24 Cal. 4th at 290.

3         B.  Discussion

4         During the penalty phase of Petitioner's trial, the prosecution presented the jury with

5    evidence regarding two previously unadjudicated offenses Petitioner allegedly committed while

6    incarcerated – the 1976 assault on inmate Robert Maytorena and the 1982 homicide of inmate

7    Jesse Apodaca.  [96 RT 11880, 11887; 97 RT 12004 - 100 RT 12628.]  The assault on Maytorena

8    took place on August 25, 1976.  [97 RT 12016-12017.] Just prior to the commencement of the

9    penalty phase of Petitioner's trial, Petitioner moved to exclude evidence of the incident.  [96 RT

10   11878-11881.]  Petitioner argued there were items of evidence which could not be located

11   including a tape made of Maytorena at the Kern Medical Center the day after the incident, the

12   photo spread shown to Maytorena, and photos showing bruises on Robert Baltierra (a fellow

13   inmate who testified during the penalty phase that he participated in planning the attack on

14   Maytorena).  Petitioner also argued Maytorena said there was an "old man" on a bunk near him at

15   the time of the stabbing, but no one was able to identify this prisoner.  Petitioner argued the

16   destruction of the photo spread, in particular, made it impossible to cross-examine Maytorena on

17   his identification of Petitioner and noted there was a confusion at the time of the incident regarding

18   proper identification.  The trial court denied Petitioner's request to exclude evidence of the

19   Mayorena incident. [96 RT 11881.]

20        Petitioner argues the delay in prosecution of the Robert Maytorena stabbing violated his

21   right to due process.  Petitioner argues the statute of limitations for assault at the time of the

22   Maytorena incident was three years, and the use of evidence regarding the stabbing more than 10

23   years after the statute of limitations expired violated the policy considerations underlying statutes

24   of limitations.  Petitioner also argues the evidence was unreliable and should not have been

25   admitted.

26        Petitioner relies primarily upon United States v. Marion, 404 U.S. 307, 322 (1971).  In

27   Marion, the Supreme Court held that the Sixth Amendment's guarantee of a speedy trial does not

28   apply until a putative defendant has been "accused."  404 U.S. at 321-22.  The Supreme Court

noted prejudice may occur from a long delay between crime and arrest or charge but that the

applicable statute of limitations was the primary mechanism to guard against such prejudice.  Id. at

322.  The Court further noted the due process clause "would require dismissal of the indictment if

it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to appellees'

rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the

accused."  Id. at 324.  As applied to this case, Petitioner argues there was no legitimate

justification for the 13-year delay in prosecuting the Maytorena stabbing and that he suffered

actual prejudice from the delay because of his inability to cross-examine Maytorena on his

identification of his assailant.  Petitioner cites numerous other cases for the proposition that

evidence introduced in a sentencing proceeding must bear "some minimal indicium of reliability

beyond mere allegation."

Nonetheless, Marion does not clearly establish a right to have evidence of unadjudicated

prior offenses excluded from the penalty phase of a trial even where the statute of limitations has

expired on such offense.  In McDowell v. Calderon, 107 F.3d 1351, 1366, *as amended and*

*superseded in part*, 116 F.3d 364, *vacated on other grounds in part by* 130 F.3d 833, 385 (9th Cir.

1997)(en banc), the Ninth Circuit upheld a conviction finding the admission of previously

unadjudicated prior offenses did not in that case violate due process.  In rejecting McDowell's due

process argument, the Ninth Circuit noted "[a] sentencer may rely on criminal conduct not

resulting in a conviction if the evidence has 'some minimal indicium of reliability beyond mere

allegation.'"  107 F.3d at 1366 (citing United States v. Ibarra, 737 F.2d 825, 827 (9th Cir. 1984).

The rule proposed by Petitioner, barring admission of unadjudicated prior offense evidence where

the statute of limitations on that underlying crime has expired, would be a new rule of criminal

procedure.  The Court is barred by Teague from granting relief on the ground asserted.

The evidence of the Maytorena incident introduced during the penalty phase of Petitioner's

trial bore at least the "minimal indicium of reliability" required to satisfy due process.  Maytorena,

the victim of the assault, was present in court to testify along with Ronald Baltierra who

participated in the assault upon Maytorena.  On cross-examination the defense was able to

question both Baltierra and Maytorena, challenging their recollection and motive for identifying

Petitioner as the assailant so many years later.  Finally, as Respondent points out, the Maytorena

incident was not the only aggravating factor alleged in the penalty phase.  In light of all the other

evidence presented during the penalty phase it cannot be said the introduction of the unadjudicated

prior offense regarding Maytorena had a "substantial and injurious effect or influence in

determining the jury's verdict."  Brecht v. Abrahamson, 407 U.S. at 619, 631.

*3.*    *Claim 24*

Petitioner alleges that "California's capital scheme, Cal. Pen. Code §§ 190.1 et seq. ("the

1978 Statute") fails to genuinely narrow the number of death-eligible offenses" in violation of his

Eighth and Fourteenth Amendment rights to due process and a reliable determination of his death

sentence.  [TAP at 68-69.]

A.  California Supreme Court's opinion

The state supreme court considered this claim on direct appeal, concluding:

> And the combination of numerous available special circumstances and
> the prosecution's charging discretion does not render the death penalty
> law invalid.  (See *People v. Lucas* (1995) 12 Cal.4th 415, 478, 48
> Cal.Rptr.2d 525, 907 P.2d 373.)

Ayala, 24 Cal.4th at 290.

B.  Discussion

Since Furman v. Georgia, 408 U.S. 238 (1972), the United States Supreme Court has

required states to limit the class of murderers to which the death penalty may be applied, and has

held that in order to survive constitutional scrutiny, a death penalty statute must "genuinely narrow

the class of persons eligible for the death penalty and must reasonably justify the imposition of a

more severe sentence on the defendant compared to others found guilty of murder."  Zant v.

Stephens, 462 U.S. 862, 876 (1983).  The Ninth Circuit has held that the "special circumstances"

section of California's death penalty statute, Cal. Penal Code § 190.2, satisfies these constitutional

requirements.  Karis v. Calderon, 283 F.3d 1117, 1141 (9th Cir. 2002); Mayfield v. Woodford, 270

F.3d 915, 924 (9th Cir. 2001) ("A reasonable jurist could not debate, therefore, that the 1978

California statute, which narrowed the class of death-eligible defendants at both the guilt and

penalty phases, was constitutional.")

- 15 -

California's eligibility factors, the special circumstances enumerated in Cal. Penal Code section 190.2, are designed to satisfy the narrowing requirement of <u>Furman v. Georgia</u>, 408 U.S. 238 (1972) (per curiam).  Petitioner notes there are currently 32 special circumstances contained in Cal. Penal Code section 190.2, largely due to the expansion of the felony murder special circumstance, with each tenet (i.e., robbery-murder, burglary-murder) considered a separate special circumstance, while at the time of his conviction, there were 26 special circumstances. [Pet. Opp. at 15.]  Petitioner asserts these special circumstances "potentially sweep[] the great majority of murderers into its grasp" and thus fails to perform the narrowing function required by federal law.  [Pet. MSA at 15.]  Petitioner argues the actual narrowing effect of the California statute can be assessed by determining the percentage of persons convicted of statutorily death-eligible murders who were actually sentenced to death, and attaches the declaration of Professor Steven F. Schatz, signed on June 23, 1999, and originally presented to the California Supreme Court during Petitioner's state habeas appeal, to illustrate this argument.  [<u>Id.</u> at 13.]

Professor Schatz conducted a study with Nina Rivkind on California cases involving murder convictions to attempt to determine "(1) the degree to which the special circumstances listed in California Penal Code § 190.2 limit death-eligibility for persons convicted of first degree murder and (2) to determine what percentage of persons convicted of first degree murder who are statutorily death-eligible are sentenced to death, <i>i.e.</i>, California's death sentence ratio."  [Ex. 1 at 1-2.]  After analyzing three groups of murder conviction cases from the appellate and trial courts between 1987-1992, Professor Schatz states that in 1985, 83% of first degree murders were classifiable as special circumstance murders under the 1978 statute, while 9.6% of those convicted of first degree murder were actually sentenced to death, thus the death sentence ratio was 11.6%. [<u>Id.</u> at 18.]  Petitioner argues that the decision in <u>Furman</u> was based, in part, on the Supreme Court's observation that "[a]lthough accurate figures are difficult to obtain, it is thought that from 15% to 20% of those convicted of murder are sentenced to death in States where it is authorized." <u>Furman</u>, 408 U.S. at 387 n.11 (dissenting opinion of Burger, C.J.).  Professor Schatz concludes:

> A statutory scheme in which 83% of first degree murderers are death-eligible does not "genuinely narrow" (<i>see Wade v. Calderon</i>, 29 F.3d 1312, 1319 (9th Cir. 1994), <i>cert. denied</i>, 115 S.Ct. 923), and, if only 11.6% of those statutorily death-eligible are sentenced to death, the scheme is more arbitrary than those in existence at the time of

1    Furman, and is therefore in violation of the Eighth Amendment.  [Id.]

2    Petitioner adds that in his case, pursuant to a prior California Supreme Court decision, the

3    robbery felony murder special circumstance required a finding of intent to kill.  Carlos v. Superior

4    Court, 35 Cal.3d 131 (1983), overruled by People v. Anderson, 43 Cal.3d 1104 (1987).  Under this

5    interpretation of the 1978 statute, 77.5% of convicted first degree murderers in 1985 would have

6    been death eligible, and the resultant death sentence ratio would have been 12.4%.  [Pet. at 71.]

7    Petitioner argues that this figure is still below the 15-20% ratio the Supreme Court had estimated

8    when deciding Furman, and thus in violation of the Constitution.  [Id.]

9    Respondent notes the Ninth Circuit has recently rejected a overbreadth challenge to a

10   specific special circumstance, lying in wait.  [Resp. Opp. at 11.];  Morales v. Woodford, 336 F.3d

11   1136, 1150-51 (9th Cir. 2003), as amended 388 F.3d 1159 (9th Cir. 2004).  Respondent goes on to

12   cite Morales in support of the assertion that Petitioner fails to show that California's death penalty

13   statute was unconstitutional in its application to his case, and thus may not challenge the statute's

14   validity.  [Resp. MTD at 13.]  Respondent concludes that Petitioner's claim fails as "one to whom

15   application of a statute is constitutional will not be heard to attack the statute on the grounds that

16   impliedly it might also be taken as applying to other persons or other situations in which its

17   application might be unconstitutional."  Houston v. Roe, 177 F.3d 901, 907 (9th Cir. 1999),

18   quoting United States v. Raines, 362 U.S. 17, 21 (1960).

19   However, the Ninth Circuit has previously allowed claims identical to the one Petitioner

20   raises in the instant case, stating that "a challenge under Furman is a challenge to the capital

21   sentencing regime as a whole, not its application to a particular defendant."  United States v.

22   Cheely, 36 F.3d 1439, 1444 n. 11 (9th Cir. 1994).  Thus, Petitioner is not foreclosed from a

23   resolution of claim 24 on the merits despite the his failure to prove the unconstitutional application

24   of the death penalty statute to his particular case.

25   In 1976, the Supreme Court reviewed numerous state death penalty statutes enacted in the

26   wake of Furman, and upheld three state death penalty statutes, finding that they sufficiently

27   narrowed the class of defenders eligible for the death penalty through either aggravating factors or

28   by the definition of capital offenses, properly considered mitigation, and guided the discretion of

the sentencing authority.  Gregg v. Georgia, 428 U.S. 153 (1976); Profitt v. Florida, 428 U.S. 242 (1976); Jurek v. Texas, 428 U.S. 262 (1976).  The Supreme Court, at the same time, invalidated two state statutes where defined capital offenses carried a mandatory imposition of death. Woodson v. North Carolina, 428 U.S. 280 (1976); Roberts v. Louisiana, 428 U.S. 325 (1976).

In California, imposing the death penalty on a criminal defendant requires a determination of death eligibility and then an additional death qualification judgment performed by the factfinder.  First, for a defendant to be death-eligible, he or she must be convicted of a crime, homicide, for which the death penalty is a proportionate punishment.  Tuilaepa v. California, 512 U.S. 967, 972 (1994).  Then, the jury must not only convict the defendant of the charged murder, but also must additionally find at least one of the special circumstances enumerated in California Penal Code § 190.2 to be true.  Id.  If the jury finds at least one charged special circumstance true, the trial proceeds to a penalty phase where the jury must take a separate list of sentencing factors into consideration under California Penal Code § 190.3, making an individualized determination of punishment based on considerations which include the circumstances of the crime as well as defendant's history and character.  Id. at 972-73.  Thus, the 1978 California statute is comparable in structure, scope, and effect to those upheld as constitutional by the United States Supreme Court.

Petitioner also argues that the intent of the 1978 death penalty statute, enacted by initiative, was to expand the 1977 statute in order to make more murders eligible for the death penalty. Petitioner quotes excerpts from a voter's pamphlet distributed in support of this measure, which assert, "[a]nd, if you were to be killed on your way home tonight simply because the murderer was high on dope and wanted a thrill, the criminal would not receive the death penalty.  Why? Because the legislature's weak death penalty law does not apply to every murder.  Proposition 7 would."  [Pet. MSA at 14.]

Despite this spirited argument, Petitioner fails to demonstrate that the California Supreme Court was objectively unreasonable in rejecting this claim on appeal.  The United States Supreme Court's decision in Furman was not based solely on any statistical determination, and Petitioner's argument is centered on his comparison of pre- and post-Furman death penalty ratios.  The

plurality opinion placed an emphasis on the failure of then- existing death penalty statutes to provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."  Furman, 408 U.S. at 313 (White, J., concurring).

The United States Supreme Court has since upheld the constitutionality of two state statutes on the grounds that both statutes satisfy the requirements set forth in Furman.  See  Gregg, 428 U.S. at 198;  Profitt, 428 U.S. at 253.  Further, the Court notes that both the Florida and Georgia statutes are substantially similar in scope and effect to that of California.  In addition, the Ninth Circuit has repeatedly upheld the constitutionality of the 1978 California statute.  See Karis, 283 F.3d at 1141; Mayfield, 270 F.3d at 924.  Accordingly, Petitioner has failed to present this Court with persuasive grounds for reversing the judgment of the state court.

In addition to his central contention, Petitioner includes an argument that the "felony murder" special circumstance is particularly broad and is applicable to all first degree murders, and thus his special circumstance finding of robbery-murder is constitutionally "problematic." [Pet. Opp. at 13.]  However, the claim he raised in the petition before the Court is to the 1978 statute as a whole, and not to the alleged infirmity of any particular special circumstance.  Further, in his case, there was also a finding of the special circumstance of multiple murder, and he does not challenge the validity of that special circumstance finding.  A true finding on one special circumstance is sufficient to sustain death eligibility.  See Cal. Penal Code § 190.2; Tuilaepa, 512 U.S. at 972.

The 1978 death penalty statute, Cal. Penal Code § 190.2, performs a genuine narrowing function and thus fulfills the constitutional requirement imposed by Furman to distinguish between those murderers who are and are not eligible for the death penalty.  Petitioner fails to establish that California's 1978 death penalty statute violates the federal Constitution.  This Court cannot say the state court's denial of Claim 24 was contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts. Williams, 529 U.S. at 412-13.  Petitioner does not merit relief on this claim.

*4.*     *Claim 25*

Petitioner alleges "California's 1978 death penalty statute gives prosecutors unbounded

1   discretion to seek the death penalty" in violation of his Eighth and Fourteenth Amendment rights

2   to due process and a reliable determination of his death sentence.  [TAP at 71.]

3

4         A.  California Supreme Court's opinion

5         The state supreme court considered this claim alongside Claim 24 on direct appeal,

6   concluding:

7                The argument that each California county improperly applies its own
             standards to death penalty prosecutions is without merit.  (*People v.*
8             *Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213];
             see also *People v. Ochoa*, *supra*, 19 Cal.4th at p. 479.)  And the
9             combination of numerous available special circumstances and the
             prosecution's charging discretion does not render the death penalty law
10            invalid.  (See *People v. Lucas* (1995) 12 Cal.4th 415, 478, 48
             Cal.Rptr.2d 525, 907 P.2d 373.)

11
    Ayala, 24 Cal.4th at 290.
12        B.  Discussion

13        The United States Supreme Court has repeatedly held that prosecutorial discretion to select

14  among eligible cases those in which the death penalty will actually be sought does not in and of

15  itself offend principles of equal protection, due process, or constitute cruel and unusual

16  punishment.  Jurek v. Texas, 428 U.S. 262, 274 (1976); Proffitt v. Florida, 428 U.S. 242, 254

17  (1976); Gregg v. Georgia, 428 U.S. 153, 199-200 (1976).  This argument has also been rejected by

18  the Ninth Circuit.  Campbell v. Kincheloe, 829 F.2d 1453, 1465 (9th Cir. 1987).  The California

19  Supreme Court has applied the federal precedent to numerous capital cases in this state.  See

20  People v. Anderson, 25 Cal.4th 543, 600 (Cal. 1999); People v. Keenan, 46 Cal.3d 478, 567 (Cal.

21  1988); People v. Williams, 16 Cal.4th 153, 278 (Cal. 1997).

22        Petitioner alleges that since the California death penalty statute fails to properly narrow the

23  number of death eligible offenses, the narrowing "function is essentially performed by the

24  prosecutor's decision to seek the death penalty in a particular case."  [Pet. MSA at 17.]  In Claim

25  24, discussed above, the Court rejected Petitioner's claim that the California death penalty statute

26  fails to perform the constitutionally required narrowing function, thus negating the predicate on

27  which Petitioner's claim is based.

28        The Court finds no case in which the United States Supreme Court has held

1  unconstitutional a selection process where a prosecutor make the decision to seek the death

2  penalty within the bounds of state law.  The Supreme Court has opined that "[a]bsent facts to the

3  contrary, it cannot be assumed that prosecutors will be motivated in their charging decisions by

4  factors other than the strength of their case and the likelihood that a jury would impose the death

5  penalty if it convicts."  Gregg, 428 U.S. at 225 (White, J., concurring).

6       Petitioner makes no specific allegations on how the prosecutor's decision to charge a

7  capital crime was arbitrary and capricious in the instant case, and the record supports the

8  California Supreme Court's denial of this claim.  Without "exceptionally clear proof," this Court

9  cannot infer that the prosecutor abused their discretion in pursuing the death penalty in Petitioner's

10  case.  McClesky v. Kemp, 481 U.S. 279, 297 (1987).  Petitioner has offered no such proof.

11      This Court cannot say the state court's denial of this claim was contrary to, or an

12  unreasonable application of, clearly established federal law, or that it was based upon an

13  unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  Petitioner does not merit

14  relief.

15                                 ***CONCLUSION***

16      For the reasons set forth herein, Respondent's motion for summary judgment on

17  Petitioner's Group 5 Claims (Claims 22-25) [Doc. Nos 210 and 211] is **GRANTED**.  Petitioner's

18  cross-motion for summary judgment on those claims [Doc. No. 213] is **DENIED**.

19      **IT IS SO ORDERED.**

20

21  **DATED:  July 9, 2007**

22                                          *Irma E. Gonzalez*

23                                          **HON. IRMA E. GONZALEZ, Chief Judge**
                                            United States District Court
                                            Southern District of California

24

25

26

27

28